**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FUTURE AMBULETTE, INC., Respondent.**

**No. 1115, Docket 89–4149.**

United States Court of Appeals, Second Circuit.

Argued April 3, 1990.

Decided May 10, 1990.

---

142

Scott D. MacDonald, N.L.R.B., Washington, D.C. (Jerry M. Hunter, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, of counsel), for petitioner.

Stuart M. Kirshenbaum, Mineola, N.Y., for respondent.

Before FEINBERG, TIMBERS, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

The National Labor Relations Board ("board") petitions for enforcement of its order awarding reinstatement and backpay to five employees discharged by Future Ambulette, Inc. in violation of the National Labor Relations Act, 29 U.S.C. § 158(a). Future Ambulette opposes enforcement, claiming that the employees were discharged in good faith for sound business reasons. We affirm the findings of the board, modify its order as to employee Howell, and enforce the order as modified.

## BACKGROUND

Future Ambulette is a company located in the Bronx, New York, which transports disabled persons from their homes to health care facilities in minivans. In early April 1987 Anthony Williams and Jeffrey Howell began a campaign to organize the company's drivers, supported by, among others, Thomas Gaton, Raymond Rodriguez, and Jose Cintron. The company responded with its own anti-union campaign, and within the next two months, fired all five of these drivers. They complained to the board.

The administrative law judge ("ALJ") found that the company had interrogated employees about union sympathy; threatened reprisals and closure of business; solicited grievances and promised benefits; made disparaging and misleading statements about the union; discharged Williams, Howell, Gaton, Rodriguez, and Cintron; and reduced Williams's hours and Rodriguez's vacation pay; all in order to discourage union membership in violation of 29 U.S.C. § 158(a)(1), (3). The ALJ ordered immediate reinstatement of the drivers to former or equivalent positions with backpay. Because Williams and Howell did not have valid drivers' licenses, the ALJ ordered that the offer of reinstatement remain open and backpay accrue so long as the company employed any driver with an invalid driver's license.

On review, the board affirmed the findings and recommendations of the ALJ, except as they related to Williams and Howell. Noting that Williams's license had already been reinstated, it modified the order to provide him with immediate reinstate-

ment and backpay. Because Howell's license was still suspended due to unpaid traffic violations, the board ordered that Howell be offered reinstatement only upon presentation of a valid license; otherwise, he was to be offered a substantially equivalent position. In addition, the board affirmed those portions of the ALJ's order requiring Future Ambulette to post a remedial notice and to cease and desist from its unfair labor practices and from interfering with employees in the exercise of their statutory rights. *NLRB v. Future Ambulette, Inc.*, 293 NLRB No. 108 (Apr. 28, 1989).

The board petitions to enforce its order. The company opposes enforcement primarily on the ground that it discharged the employees in good faith for sound business reasons.

## DISCUSSION

### A. Wrongful Discharge by Future Ambulette

■ It is an unfair labor practice for an employer to fire an employee because of the employee's union activity. 29 U.S.C. §§ 158(a)(1), (3). Under the *Wright–Line* mixed-motive test, where an employer's discharge of an employee is shown to be partially motivated by anti-union animus, the employer can avoid a violation only by showing that it would have taken the same action even in the absence of the employee's support of the union. *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083 (1980), approved by *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 395, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983).

Future Ambulette does not contest the finding that anti-union animus was a motivating factor for discharging these employees; nor could it reasonably do so on this record. From the moment the organizing campaign began, the company embarked on a course of action directed at undermining the effort. It questioned employees about their union sentiments and the sentiments of fellow employees to discover which employees were active union supporters; it threatened reprisals and closure; and it

discharged the two most active organizers, Williams and Howell, less than a month into the organizing effort. *See NLRB v. J. Coty Messenger Service, Inc.*, 763 F.2d 92, 98–99 (2d Cir.1985).

The company argues instead that despite its opposition to a union, it fired these particular employees for sound business reasons. To address that contention, we consider each of the five employees to determine whether substantial evidence supports the board's findings. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

### 1. *Williams.*

■ Future Ambulette claims it discharged Williams because his driver's license had been suspended; because he had a bad driving record; and because of a patient's complaint. However, Williams was fired on May 6, and the company's general manager, Charles Dippolito, admitted that the company did not know of the suspended license until July 7. Further, the company did not discharge other drivers with suspended or invalid licenses and other drivers with worse driving records. Such disparate treatment of Williams tends to support the inference of an unlawful motive, rather than good faith business judgment. *J. Coty Messenger Service*, 763 F.2d at 98. Finally, the patient's complaint was actively solicited by Dippolito, under circumstances indicating that he was attempting to build a case against Williams as a pretext for the discharge. *See United Aircraft Corp. v. NLRB*, 440 F.2d 85, 92 (2d Cir.1971).

### 2. *Howell.*

■ The company claimed it fired Howell because his driver's license had been suspended. Yet the company retained other drivers with invalid licenses, and it knew as early as February that Howell's license had been suspended, but it took no disciplinary action against him until May, after the union organizing had begun. The disparate treatment and lack of action both support the inference of an illegal motive.

*See Southwire Co. v. NLRB*, 820 F.2d 453, 461 (D.C.Cir.1987).

### 3. *Gaton.*

■ For Gaton's discharge Future Ambulette relies on claimed bad work and driving records. However, it never told him his work was unacceptable, and employees with worse records were not discharged. The failure to explain or offer a reason for discharge in light of other employees' more serious deficiencies supports the board's inference that Gaton's union support was the real reason for the discharge. *See NLRB v. Malta Construction Co.*, 806 F.2d 1009, 1012 (11th Cir.1986).

### 4. *Rodriguez.*

■ When the company discharged Rodriguez on the day of the union election, it offered him no explanation. The company now claims it was because he was a reckless driver. Dippolito testified that he had other concerns as well, including suspicions of drug use, three accidents in the prior 11 months, and Rodriguez's failure to handle patients properly. However, in later testimony, Dippolito acknowledged that his suspicions of Rodriguez's drug use were not the basis for the discharge, and then for the first time he mentioned a patient's complaint about Rodriguez. Whatever its real concerns, Future Ambulette offered no explanation for waiting to take action on them until the election. Moreover, the vacillating testimony by Dippolito about these claimed justifications implies an attempt to construct a plausible reason for the discharge in order to hide a discriminatory motive. *See NLRB v. Nevis Industries, Inc.*, 647 F.2d 905, 910 (9th Cir.1981); *NLRB v. Georgia Rug Mill*, 308 F.2d 89, 91 (5th Cir.1962).

### 5. *Cintron.*

■ Finally, the company asserts it did nothing at all wrong in relation to Cintron, because it never actually discharged him. Shortly before the election, the company had informed Cintron that it would keep his position open for him during his recuperation from a broken leg. However, after he was seen voting at the union election and after he signed a union authorization card, the company changed its position and notified him it would not keep his position open during his disability. Instead, it offered to consider a new application should he decide to reapply for a position. It was reasonable under the circumstances for Cintron to assume, and the board to find, that he had been fired, even though no reason was given. *See NLRB v. Trumbull Asphalt Co. of Delaware*, 327 F.2d 841, 843 (8th Cir.1964). Thus, the company's explanation is no more compelling than the others.

In short, there is substantial evidence in the record to indicate that the company had an anti-union animus and knowledge of these employees' support for unionization; that each of the five employees was summarily discharged and disparately treated; and that Future Ambulette offered only shifting, after-the-fact explanations for its conduct. Thus, there is no reason to disturb the board's conclusions that the alleged reasons for discharge were pretextual and that Future Ambulette wrongfully discharged these employees because of their union activities.

### B. The Board's Order

■ The board is vested with broad power to remedy unfair labor practices, *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 898, 104 S.Ct. 2803, 2812, 81 L.Ed.2d 732 (1984), and an order by the board should not be disturbed unless it fails to "effectuate the policies of the Act." 29 U.S.C. § 160(a); *see Sure–Tan*, 467 U.S. at 900, 104 S.Ct. at 2812. Although we cannot substitute our judgment for the board's, we have the authority to modify an order to ensure that it does effectuate those policies. 29 U.S.C. §§ 160(e), (f); *Sure–Tan*, 467 U.S. at 899, 104 S.Ct. at 2812. Because the order in respect to Howell does not effectuate the policies of the act, it must be modified.

■ The board ordered that Howell was entitled to an offer of full reinstatement upon the presentation of a valid driver's license. It also provided, however, that if Howell was unable to obtain a valid license within a reasonable time, the com-

pany would have to reinstate him to a substantially equivalent position; and that if no substantially equivalent position existed, the company would be obligated for backpay until Howell obtained substantially equivalent employment elsewhere. Since the order placed no burden on Howell either to pay his traffic fines so he could get his license, or to use reasonable diligence in seeking alternative employment, we conclude that it does not effectuate the policies of the act. It fails to give due consideration to Howell's duty to mitigate damages; it tends to encourage illegal hiring activities; and it is not sufficiently tailored to remedy the actual discrimination.

First, the employee has a duty to mitigate his damages. *Sure–Tan*, 467 U.S. at 901, 104 S.Ct. at 2813. This order, however, is open-ended in regard to reinstatement, seeming to leave in Howell's hands whether to seek reinstatement and whether to seek equivalent employment elsewhere. If Howell could not legally be rehired as a driver because he is unwilling or unable to pay the fines necessary to obtain his license, Future Ambulette would nevertheless under this order be obligated to offer him a substantially equivalent position. Such a result ignores Howell's duty to mitigate damages, and it unfairly penalizes the company, for without a license Howell would not be legally eligible to work as a driver, the only task he ever performed for the company.

Further, "it has never been the policy of the Act to force an employer to abandon *legal* hiring practices." *NLRB v. Solboro Knitting Mills, Inc.*, 572 F.2d 936, 946 (2d Cir.) (emphasis in original), *cert. denied*, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). The order requires backpay for Howell to accrue so long as he is out of work; thus, it tends to pressure the company to rehire Howell even if he lacks a valid license, in order to avoid backpay liability. We cannot condone an order which may encourage illegal hiring practices and a violation of New York's motor vehicle laws. *See Sure–Tan*, 467 U.S. at 902, 104 S.Ct. at 2814 (court of appeals' modification of order to condition reinstatement upon illegal

alien's legal reentry to United States is appropriate).

Finally, a remedy must "be tailored to the unfair labor practice it is intended to redress." *Sure–Tan*, 467 U.S. at 900, 104 S.Ct. at 2813. Since Howell could not legally drive for this company without a valid license, he was wronged only to the extent that the company failed to employ him while continuing to employ other unlicensed drivers. At the point that Future Ambulette may stop employing unlicensed drivers, its discrimination against Howell would also cease. Because the order allows backpay to accumulate regardless of whether the company employs other unlicensed drivers, it redresses more than the company's actual discrimination against Howell.

For these reasons, as to Howell, we modify the board's order as follows: 1) Future Ambulette shall offer reinstatement to Howell; Howell shall respond to the offer promptly, but shall have a reasonable time to pay his fines and obtain a valid driver's license. 2) Reinstatement shall be conditioned upon Howell's presenting a valid driver's license within that reasonable time. 3) If he does not do so, Future Ambulette will have no further obligation to reemploy him. 4) In addition, however, Howell is entitled to backpay until the earlier of his actual reinstatement, his refusal of reinstatement, or his failure to timely present his driver's license. 5) The backpay obligation of paragraph 4) shall be limited to those periods during which either Future Ambulette employed other unlicensed drivers or Howell himself had a valid license.

The remainder of the board's order, including the relief for Williams, Rodriguez, Gaton, and Cintron, is affirmed.

## CONCLUSION

We affirm the findings of the board and enforce the order as modified.