## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## A.P.R.A. FUEL OIL BUYERS GROUP, INC., Prudential Transportation, Inc., and Amer–National Heating Service, Inc., Respondents.

No. 1324, Docket 96–4123.

United States Court of Appeals, Second Circuit.

Argued April 23, 1997.

Decided Dec. 5, 1997.

Fred L. Cornnell, Supervisory Attorney, National Labor Relations Board, Washington, DC (Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, of counsel), for Petitioner.

Lionel Alan Marks, New York City, for Respondents.

Jonathan P. Hiatt, James Coppess, AFL–CIO, Washington, DC; David M. Silberman, Laurence Gold, Bredhoff & Kaiser, Washington, DC; Max Zimny, Catherine Waelder, Unite, New York, NY; Judith A. Scott, Betty

Grdina, International Brotherhood of Teamsters, Washington, DC; and Robert H. Gibbs, Gibbs, Houston & Pauw, Seattle, WA, for AFL–CIO as Amicus Curiae in support of Petitioner.

Before OAKES, ALTIMARI and JACOBS, Circuit Judges.

OAKES, Senior Circuit Judge:

In the simplest terms, this appeal raises the question whether an employer who knowingly hires undocumented aliens can use the immigration laws as a shield to avoid liability for the employer's later retaliatory discharge of the employees in violation of the National Labor Relations Act, 29 U.S.C. §§ 151–168 (1994) ("NLRA" or "the Act"). We conclude that the National Labor Relations Board ("NLRB" or "the Board") does have the power to remedy such employer misconduct, and that the remedy it fashioned in this case properly balanced the various federal policies implicated by the employer's illegal actions.

At an earlier stage of this proceeding, this Court affirmed, by unreported summary order, all of the Board's unfair labor practice findings, including its findings that the Company unlawfully discharged two undocumented aliens, Victor Benavides and Alberto Guzman. *N.L.R.B. v. A.P.R.A. Fuel Oil Buyers Group*, 28 F.3d 103 (2d Cir.1994). We now must consider an issue that the Board severed from the earlier appeal, namely, the nature of the remedy, if any, that should be granted to Benavides and Guzman.

## I.

*The Board's Factual Determinations.*

A. *Employer Hires Benavides and Guzman with Full Knowledge that They Lack Proper Work Authorization.*

The Board found the following facts. A.P.R.A. Fuel Oil Buyers Group, Inc. ("the Company" or "the Employer"), which operates from a facility in Brooklyn, New York, purchases and transports heating oil and performs repairs on oil and gas burners. The Company hired Benavides and Guzman after each of them had explained that he was not eligible for lawful employment in the United States because of his immigration status.

Employee Victor Benavides, whose real name is Jose Ciudad, worked as a boiler mechanic. Before Benavides began work on August 15, 1990, he told Vincent Latora, President of Respondent Prudential Transportation, Inc., that he had entered the country on a six-month visitor's visa, and that he lacked the required "green card" to work in the United States. Latora told Benavides that he must have a legal name so that the Company could put him in its books. Benavides explained to Latora that the real Victor Benavides, who was leaving the country, had given Benavides his social security card to use to obtain employment.

Employee Guzman, whose real name is Jorge Bianey Diaz, worked for the Company as a truck mechanic at various times between June 1989 and January 1991. When Latora first interviewed Guzman, Guzman told him that he, Guzman, was in the United States illegally and had no working papers. Latora directed him to get a social security card, and he obtained one in the name of Alberto Guzman.

B. *Benavides and Guzman Participate in a Union Organizing Campaign and the Company Discharges Them and Four Other Union Supporters.*

In the fall of 1990, the Company's employees began an organizing campaign seeking representation by Local 533, International Brotherhood of Teamsters, AFL–CIO ("the Union"). Benavides and Guzman signed union authorization cards and Guzman attended a union meeting. On January 8, 1991, Latora handed Benavides and Guzman prepared affidavits stating that they disavowed their signatures on those cards and that they did not want to be represented by the Union. Latora ordered them to sign, saying that they would lose their jobs if they did not. Benavides and Guzman both signed the affidavits. Latora later asked Guzman to identify the leaders of the organizing campaign, and asked why he, Guzman, was "knifing me in the back." The Board also found that the Company authorized further unlawful, coer-

cive, anti-union activity aimed at Guzman and other employees who supported the union.

The Company discharged Guzman on January 14, 1991, and Benavides on February 3, 1991. In an earlier decision of the Board, which was affirmed by this court, the Board found that neither Guzman nor Benavides would have been discharged but for the ongoing union activities of the Company's employees and that their discharges therefore violated Section 8(a)(3) of the Act. *A.P.R.A. Fuel Oil Buyers Group, Inc.*, 309 N.L.R.B. 480 (1992), *aff'd*, 28 F.3d 103 (2d Cir.1994). On March 6, 1991, the Board conducted an election; on November 12, 1992, the Board overruled the challenges to the ballots of Guzman, Benavides and several other employees, and the Regional Director subsequently determined that the Union had won the election by a margin of 11 to 8. The union was then certified as the employees' collective bargaining unit.

### C. The Conditional Reinstatement and Backpay Order.

The Board's order of November 12 also required the Company to reinstate Guzman and Benavides and pay them compensation for the period of their illegal termination. In an unpublished order issued on July 28, 1993, the Board *sua sponte* decided that "the issue of whether Victor Benavides and Alberto Guzman are entitled to reinstatement and backpay merits further consideration." The Board, accordingly, severed the remedy portion of its decision with respect to Benavides and Guzman.[1]

On December 21, 1995, the Board issued a Supplemental Decision and Order in which it sought to accommodate its affirmative remedy for Benavides and Guzman to the requirements of the federal immigration laws, including the Immigration Reform and Control Act of 1986, Pub.L. No. 99–203, 100 Stat. 3359 (codified as amended in scattered sections of 8 U.S.C.) ("IRCA"). *A.P.R.A. Fuel Oil Buyers Group, Inc.*, 320 N.L.R.B. 408, 414–16 (1995). The Board (Chairman Gould and Member Truesdale, Member Browning dissenting in part, and Member Cohen dis-

senting in part) ordered the Company to offer reinstatement to Benavides and Guzman, but conditioned the Company's obligation to reinstate them on their satisfaction of the normal verification of eligibility requirements prescribed by IRCA. *Id.* at 415. Specifically, the Board held that the company would be obligated to reinstate them only if they completed the INS Form I-9 and presented the appropriate supporting documents "within a reasonable time" so that the Company could "meet its obligations under IRCA." *Id.*

The Board also ordered the Company to pay Benavides and Guzman backpay from the date of their unlawful discharges until "the earliest of the following: their reinstatement by the Company, subject to compliance with the Company's normal obligations under the IRCA, or their failure after a reasonable time to produce the documents enabling the Company to meet its obligations under IRCA." *Id.* at 416. In addition, the Board ordered the Company to remove from its files any reference to their unlawful discharges and to post appropriate notice. *Id.* at 417. The Board's order is a final order under § 10(e) of the Act, 29 U.S.C. § 160(e) (1994). This court has jurisdiction pursuant to § 10(e) because the unfair labor practice occurred in New York.

## II.

### Discussion.

#### A. Standard of Review.

It is settled law that the Board's power to issue remedial orders " 'is a broad discretionary one, subject to limited judicial review.' " *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 960 (2d Cir.1988) (quoting *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964)). Accordingly, we will not disturb a Board remedial order " 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " *NLRB v. Katz's Delicatessen, Inc.*,

---

1. Similar relief granted to four other improperly terminated employees, who were authorized to work in the United States, was not disturbed by the Board's decision.

80 F.3d 755, 769 (2d Cir.1996) (quoting *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)).

In crafting its remedies, however, the Board must take into account other federal laws. *See Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 903, 104 S.Ct. 2803, 2814, 81 L.Ed.2d 732 (1984); *Southern S.S. Co. v. NLRB*, 316 U.S. 31, 47, 62 S.Ct. 886, 894, 86 L.Ed. 1246 (1942). This appeal raises a question concerning one aspect of the interaction of the NLRA and the Immigration and Nationality Act, 18 U.S.C. 1101 (1994) ("the INA"), as amended by IRCA. Where the Board has accounted for the goals of another statute in ordering its remedy, a reviewing court will affirm that remedy if the Board has "reconciled the two statutes in a reasonable way." *NLRB v. Lee Hotel Corp.*, 13 F.3d 1347, 1351 (9th Cir.1994). This standard of review, while still affording the Board considerable deference to the extent it is advancing the purposes of the NLRA, is more stringent with respect to the other statutes that Congress has not committed to the Board's charge. Indeed, it has been said that the Board's interpretation of the INA is entitled to no deference at all. *Bevles Co. v. Teamsters Local 986*, 791 F.2d 1391, 1393 n. 3 (9th Cir.1986).

### B. *Sure–Tan and the Pre–IRCA Case law.*

Although Congress has modified the INA several times since 1984, the Supreme Court's decision in *Sure–Tan* still sets the background for this appeal. *Sure–Tan* involved two small Chicago tanneries, the employees of which elected a union as their bargaining representative. Many of these employees were undocumented workers. After the Board rejected the employer's contention that the undocumented employees were not entitled to the protection of the NLRA, Sure–Tan wrote to the INS requesting an investigation into the immigration status of some of its employees. INS agents promptly came to Sure–Tan's facility and arrested five employees. The undocumented aliens then voluntarily left the United States to avoid deportation. The Board determined that Sure–Tan had reported the undocumented aliens to the INS in retaliation for their support of the Union. As a remedy, the Board awarded reinstatement conditioned on the employees' legal reentry into the country, and backpay, the amount of which was to be determined later at a compliance hearing. The Court of Appeals for the Seventh Circuit modified the remedy in several respects, including directing the Board to award a minimum of six months' backpay.

While approving of the Board's decision that these employees were covered by the Act and that the employer's call to the INS thus violated the Act, the Supreme Court criticized the decision to award a minimum of six months' backpay without regard for the employees' actual economic loss or availability to work. The Court found that the award exceeded the court of appeals' limited power of review and was not supported by evidence and record findings that the employer would have continued to employ the undocumented workers for such a period before the INS would have deported them. *Id.* at 901–05, 104 S.Ct. at 2813–15. Generally, the Supreme Court cautioned that the Board must tailor its remedies to avoid "a potential conflict with the INA," and that therefore the employees must be deemed ineligible for backpay "during any period when they were not lawfully entitled to be present and employed in the United States." *Id.* at 903, 104 S.Ct. at 2814.

This court and the Ninth Circuit have subsequently interpreted *Sure–Tan* as addressing only awards of backpay to undocumented employees who have left the country, and held that, when undocumented employees remain in the United States after their illegal termination, backpay may appropriately be awarded.

In *Local 512 v. NLRB ("Felbro")*, 795 F.2d 705, 722 (9th Cir.1986), the Ninth Circuit reached this holding after observing that "*Sure–Tan* gave no indication that it was overruling a significant line of precedent that disregards a discriminatee's *legal status*, as opposed to *availability to work*, in determining his or her eligibility for back pay." *Id.* at 717 (emphasis in the original) (citing, *inter alia*, cases in which underage discriminatees,

and an unlicensed truck driver and engineer were ordered reinstated with backpay). *Felbro* also explained that the backpay remedy was not simply compensatory: "[b]ackpay awards also achieve a public purpose by deterring future similar unlawful practices, and by depriving employers of any competitive advantage they may have secured by acting unlawfully." *Id.* at 718 (citations omitted). The court determined that "[t]he Court in *Sure–Tan* was not dealing with the employment of undocumented workers but was primarily concerned with the INA's prohibition against illegal entry into the United States." *Id.* at 719. This prohibition against illegal entry was what rendered the employees in *Sure–Tan* unavailable for work during the backpay period. Since Congress had not yet made the employment of illegal aliens a crime separate from the unlawful entry into the country, the Ninth Circuit concluded that the employment of undocumented workers was "peripheral" to the INA and that "an award of backpay to [discriminatees remaining in the United States] would not impinge on th[e] central concern of the INA." *Id.* at 719–20 (internal quotations omitted). Finally, the court noted that significant questions of competence and procedure could arise if the Board were required to make determinations of immigration status, which are beyond its statutory mandate. *Felbro,* 795 F.2d at 721–22.

This court, in the context of a case arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, adopted the Ninth Circuit's holding to conclude "that undocumented workers who have remained in the country are eligible for back pay as of the time of the violation." *Rios v. Local 638,* 860 F.2d 1168, 1173 (2d Cir.1988). In reaching this conclusion, we distinguished *Sure–Tan* in the same manner as the Ninth Circuit:

> The present case is clearly distinguishable from *Sure–Tan* in this respect. The claimants here have never been deported or forced to leave the country to avoid deportation. Thus, there could be no enticement, by offer of employment or back pay, for them to reenter the country illegally. Moreover, these claimants were available for employment during the entire period

covered by the back pay order, since such employment would have violated no immigration law. We therefore disagree with the Union's contention that the claimants were "legally unavailable" for employment.

*Id.* at 1173 (footnote omitted). The Board relied upon this holding of our court and of the Ninth Circuit, as well as its own assessment of the underlying purpose of the NLRA and of IRCA, to support the remedy awarded Guzman and Benavides.

### C. *IRCA.*

■ The enactment of IRCA changed the INA's silence with respect to the employment of illegal aliens that was a significant element of the holdings in *Sure–Tan, Felbro,* and *Rios.* IRCA established sanctions for employers who knowingly hire or continue to employ illegal aliens, *see* 8 U.S.C. § 1324a(a), and also introduced procedures to assure that undocumented workers are not able to gain employment in the United States, *see* 8 U.S.C. § 1324a(b). However, IRCA does not materially change the policy considerations underlying the previous decisions. The primary purpose of IRCA was to make it more difficult to employ undocumented workers and to punish the employers who offer jobs to these workers. IRCA's legislative history explains Congress's reasons for adopting this employer-focused enforcement strategy, and also demonstrates the intention to preserve the NLRA's protection of and remedies for undocumented workers as one of the many elements in the federal government's strategy to protect U.S. labor markets from the effects of illegal immigration. In short, as the discussion below demonstrates, Congress sought to reduce the availability of jobs for undocumented workers without adversely affecting working conditions within those jobs.

IRCA was passed to reduce the incentives for employers to hire illegal aliens. A House Judiciary Committee report accompanying IRCA explained that "employment is the magnet that attracts aliens here illegally." H.R.Rep. No. 99–682(I) (1986), at 46 *reprinted in* 1986 U.S.C.C.A.N. 5649, 5650. The report went on to discuss how the willingness of many illegal immigrants to accept low wages and substandard conditions makes

them attractive to some employers who are ready to "exploit [them as a] source of labor" often to the detriment of United States workers whose wages are depressed or whose jobs are lost. *Id.* at 47, 52, 58, *reprinted in* 1986 U.S.C.C.A.N. at 5651, 5656, 5662.

▮ In light of these findings and legislative concerns, IRCA adopted sanctions focused on the employers of illegal immigrants as the principal method of eliminating the job opportunities that entice unskilled, illegal immigrant labor to the United States. *Id.* at 46, *reprinted in* 1986 U.S.C.C.A.N. at 5650. The heart of the act is a provision making it unlawful for any person or entity to hire, recruit, or refer for employment any person known to be unauthorized to work in this country. *Id.* at 46, 91, *reprinted in* 1986 U.S.C.C.A.N. at 5650, 5695. IRCA thus demonstrates Congress's intent to focus on employers, not employees, in deterring unlawful employment relationships.[2]

▮ Moreover, in an effort not to exacerbate the appeal of illegal workers to unscrupulous employers, IRCA, as the Judiciary Committee report makes clear, does not reduce the legal protections and remedies for undocumented workers under other laws. Specifically, the report states that IRCA was "not intended to limit in any way the scope of the term 'employee'" under the Act or the scope of "the rights and protections stated in Sections 7 and 8 of that Act." *Id.* at 58, 1986 U.S.C.C.A.N. at 5662 (referring to provisions, codified at 29 U.S.C. §§ 157, 158, which guarantee the right to organize, bargain collectively through representatives, and to be free of unfair labor practices designed to prevent such activities). The report further clarified that IRCA was not intended to "limit the

powers" of the Board "to remedy unfair practices committed against undocumented employees." *Id.*[3]

▮ The Board, in view of IRCA's focus on employer conduct and of these clear statements from IRCA's legislative history, reasonably found that Congress intended for the Act to continue to serve its historical purpose of helping to reduce the economic incentives that prompt some employers to hire undocumented workers. Indeed, as the Board pointed out, the report of the Judiciary Committee "explicitly disclaims" any intention to limit the Board's remedial powers. *A.P.R.A. Fuel*, 320 N.L.R.B. at 414. We therefore hold without hesitation that IRCA did not diminish the Board's power to craft remedies for violations of the NLRA, provided that the Board's remedies do not conflict with the requirements of IRCA.

### D. *The Remedy Awarded to Guzman and Benavides.*

The Board awarded Benavides and Guzman conditional reinstatement and backpay. The Board described the decision it was required to make as follows:

> Despite the obvious congressional intent that IRCA and the NLRA operate in tandem, the practical implementation of this objective requires that the Board make policy choices. After considering the many complexities of the policies underlying both statutes, we conclude that the most effective way for the Board to accommodate—and indeed to further—the immigration policies IRCA embodies is, to the extent possible, to provide the protections and remedies of the NLRA to undocu-

---

2. The only provisions aimed at employees set out penalties for prospective employees who falsely document or attest that they are lawfully eligible for work. IRCA §§ 101(a), 103, 100 Stat. 3362, 3380 (codified as amended at 8 U.S.C. § 1324a(b)(2); 18 U.S.C. § 1546 (1994)). However, these requirements are secondary compared to the numerous sanctions directed at employers. *See, e.g.*, H.R.Rep. No. 99–682(I) at 46, *reprinted in* 1986 U.S.C.C.A.N. at 5650 ("The principal means of ... curtailing future illegal immigration ... is through employer sanctions.")

3. In a separate report, the House Education and Labor Committee stated that agencies "such as the Occupational Safety and Health Administration, the Wage and Hour Division of the Department of Labor, [and] the Equal Employment Opportunity Commission," should continue to "remedy unfair practices committed against undocumented employees.... To do otherwise would be counter-productive of our intent to limit the hiring of undocumented employees and the depressing effect on working conditions caused by their employment." H.R.Rep. No. 99–682(II), at 8–9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5757, 5758.

mented workers in the same manner as to other employees. To do otherwise would increase the incentives for some unscrupulous employers to play the provisions of the NLRA and IRCA against each other to defeat the fundamental objectives of each, while profiting from their own wrongdoing with relative impunity. Thus, these employers would be free to flout their obligations under the Act, secure in the knowledge that the Board would be powerless fully to remedy their violations.

*Id.* at 415. We agree with the Board that its remedy promotes the shared policy goals of IRCA and the NLRA, and avoids any conflict with the specific provisions of IRCA.

### 1. *Conditional reinstatement.*

The Board ordered the Company to offer reinstatement to Benavides and Guzman, "provided that they present within a reasonable time, INS Form I–9 and the appropriate supporting documents, in order to allow the [Company] to meet its obligations under IRCA." *Id.* The reinstatement order, accordingly, does not require the Company to violate IRCA. To the contrary, the Board's order quite clearly tailors the remedy for the violation of the NLRA to the restrictions of the other law.

In crafting this remedy, the Board noted that conditional remedies have been awarded in other cases "when reinstatement would require the removal of a legal disability." *Id.* (discussing *NLRB v. Future Ambulette Inc.,* 903 F.2d 140, 145 (2d Cir.1990) (ordering conditional reinstatement of a driver whose license had been suspended)). The reinstatement order provides a measure of compensatory relief that is properly gauged to Benavides's and Guzman's right (or lack thereof) to work in the United States. We also note that the remedy felicitously keeps the Board out of the process of determining an employee's immigration status, leaving compliance with IRCA to the private parties to whom the law applies. As the Ninth Circuit noted in *Felbro,* the Board is not charged with the enforcement of the complex U.S. immigration laws. *Felbro,* 795 F.2d at 721–22.

### 2. *Backpay.*

The backpay order provides that Benavides and Guzman be paid from the date of their unlawful discharge until either their qualification for future employment or the expiration of the reasonable time allowed for them to comply with IRCA. The time limit is intended to ensure that the Company will not be pressured to reinstate them in violation of IRCA in an effort to lessen its liability. *A.P.R.A. Fuel,* 320 N.L.R.B. at 416; *see also Future Ambulette,* 903 F.2d at 145 (ordering a similar time limit so that employer would not be tempted to rehire unlicensed driver before the driver had obtained a valid license).

This remedy promotes the shared policy goals of the IRCA and the NLRA for several reasons discussed by the Board. First, the remedy does not create an additional incentive for unscrupulous employers to employ illegal aliens. In doing so, the Board's remedy helps to ensure that employers who comply with IRCA do not suffer a competitive disadvantage for their obedience to the law.

Conversely, precluding the remedy would increase the incentives for employers to hire undocumented aliens. The Board found that the denial of a backpay remedy would frustrate the objectives of IRCA and the NLRA by undermining the deterrent effect of the monetary penalties imposed by IRCA. Many employers, as the Board found, might well consider the fines to be a "reasonable expense more than offset by the savings of employing undocumented workers or the perceived benefits of union avoidance." *A.P.R.A. Fuel,* 320 N.L.R.B. at 415. In other words, failure to enforce any backpay remedies would encourage employers to compare the expense of IRCA's fines to the expenses of backpay and the advantage gained in resisting unions, and potentially to decide that the risk of IRCA's penalties are worth incurring. We find the Board's reasoning persuasive. *See Patel v. Quality Inn South,* 846 F.2d 700, 704 (11th Cir.1988) (finding that if the Fair Labor Standards Act did not cover undocumented aliens, employers might find it economically advantageous to hire them in spite of IRCA's penalties).

Third, the Board found that the lack of a backpay remedy would make undocumented workers an easy target for employers resisting union organization, and, thus, frustrate the rights of lawful U.S. workers under the NLRA. An employer could intimidate United States citizens and other lawful residents by targeting undocumented workers for anti-union discharges. Or, alternatively, legal workers might be reluctant to organize in the first instance if the Board were unable to issue any remedy against illegal actions taken by employers against undocumented workers who support the union. *A.P.R.A. Fuel*, 320 N.L.R.B. at 412–13. Again, we find the Board's reasoning persuasive, and agree that the facts of this very case illustrate how illegal threats to, and discharges of, undocumented workers can harm the rights of legal workers under the Act.

Finally, the backpay order does not require the reestablishment of an employment relationship in contravention of IRCA. Instead, it simply compensates Benavides and Guzman for the economic injury they suffered as a result of the Company's unlawful discrimination against them. *See A.P.R.A. Fuel Oil Buyers Group, Inc.*, 309 N.L.R.B. 480 (1992) (finding that the Company would not have fired Benavides and Guzman but for their union activity), *aff'd*, 28 F.3d 103 (2d Cir.1994). Accordingly, nothing in the Board's order requires the company or the employers to violate IRCA. *See, e.g., Future Ambulette*, 903 F.2d at 145 (finding that while the Board may not "force an employer to abandon legal hiring practices," an award of backpay to compensate unlicensed driver for actual economic injury sustained as a result of employer's discrimination was appropriate).

The Company argues that IRCA bars all backpay to undocumented aliens hired after its enactment. The Company relies heavily on a decision of the Seventh Circuit that endorsed the Company's position while holding that *Sure–Tan* also prevents the Board from awarding backpay to undocumented workers who were hired *before* the effective date of IRCA. *Del Rey Tortilleria, Inc. v.*

*NLRB*, 976 F.2d 1115, 1121–22 (7th Cir. 1992). We find the Company's argument and the position of the Seventh Circuit unpersuasive for two related reasons. First, *Del Rey* flatly rejected the Ninth Circuit's and this court's interpretation of *Sure–Tan*. *Id.* at 1119. Second, the Seventh Circuit's decision erroneously assumed that Congress had endorsed its understanding of *Sure–Tan* when it enacted IRCA.

The opinion of the panel in *Del Rey* found that *Sure–Tan* imposed a blanket prohibition against orders of backpay in favor of undocumented workers, including those who remain in the United States after their unlawful discharges. *Id.* at 1121.[4] The Seventh Circuit then proceeded to discuss IRCA with the assumption that Congress understood *Sure–Tan* as it did and endorsed that understanding when it passed IRCA. Nothing in the statute or its legislative history suggesting that Congress preferred either the Seventh or Ninth Circuit's understanding of *Sure–Tan* has been called to our attention. We therefore, think that the Seventh Circuit concluded too hastily that Congress rejected the reasoning of *Felbro*. Indeed, in our view, IRCA demonstrates a Congressional intent to punish the employers of illegal aliens, not to grant them any additional reward for their illegal actions. And, as this court has already adopted *Felbro's* thoughtful and well-grounded reasoning, we see nothing in IRCA that limits the Board's power to grant a remedy of backpay that is tailored to the verification requirements of IRCA.

E. *The Effect of Subsequent Immigration Legislation.*

■ The Company also relies upon the civil penalties for document fraud established by the Immigration Act of 1990 § 544(a), 8 U.S.C. § 1324c (1994), and modified by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009–570. These laws amended the INA to establish civil penalties and other sanctions for undocumented aliens who use false documents to obtain employment in the United States. The Company contends

---

**4.** This understanding of *Sure–Tan* was rejected by the Ninth Circuit and by this court for the

reasons mentioned above in the discussion of *Felbro*.

that these laws signaled a change in the immigration policy of the United States, and deprived the Board of the discretion to award backpay to undocumented workers.

We do not believe these laws are relevant to the present case. The 1990 amendment applied only to "persons or entities who have committed violations on or after the date of enactment," which was November 29, 1990. Immigration Act of 1990, Pub.L. No. 101–649 § 544(c), 104 Stat. 4978, 5061. In light of the Board's finding that both Benavides and Guzman submitted documents prior to that date, they were not subject to the Act or its amendment.

We have considered the Company's procedural and other, additional arguments and find them to be without merit.

### Conclusion.

The remedy issued by the Board to Benavides and Guzman is affirmed.

JACOBS, Circuit Judge (concurring in part, dissenting in part):

I concur in much of the majority opinion. Specifically, I agree that the Board has the power to order the Company to reinstate Benavides and Guzman, and that the Board properly conditioned that order upon their satisfaction of the normal requirements for verification of eligibility prescribed by the immigration laws. I also agree with the general proposition that the Board can award backpay to compensate an undocumented alien for injuries suffered as a result of an employer's discrimination. However, I respectfully dissent because I disagree with the majority's conclusion that, under current immigration law, backpay may be awarded for a period in which the alien's employment was unlawful.

IRCA, enacted in 1986, makes it unlawful to (i) hire, or continue to employ, an alien "knowing the alien is [or has become] an unauthorized alien," or (ii) hire an alien without complying with the extensive "employment verification system"—essentially a mandatory document review procedure—that is established by the statute. *See* 8 U.S.C. 1324a(a), (b).

In my view, we should deny enforcement of the NLRB's order as written and should modify it to provide that Benavides and Guzman are entitled to backpay *only* from the date on which they established their eligibility for employment under the immigration laws, and *not* for any prior period in which they were unauthorized to work in the United States, and United States employers were forbidden to employ them. The backpay formulation that I would adopt has the indispensable virtue of being consistent with IRCA and the pre-IRCA case law. Moreover, it promotes the policies common to both IRCA and the NLRA; and it encourages aliens to seek lawful status and lawful employment.

It is possible that my approach will not yield a recovery for Benavides and Guzman; if so, that will be because they have remained in the United States for the six years following their discharge without having established lawful immigration and work status, or without trying to do so. But it is reasonable to expect an alien to comply with the immigration laws as a prerequisite to obtaining backpay; indeed, the majority correctly holds that such compliance is a prerequisite to obtaining reinstatement.

### A

This is a case that requires the Board to craft a remedy that avoids conflict between the NLRA and another federal statute. According to the majority, the standard of review is that we will enforce such a remedy if the Board "reconciled the two statutes in a reasonable way." Maj. Op. at 54, quoting *NLRB v. Lee Hotel Corp.*, 13 F.3d 1347, 1351 (9th Cir.1994). This standard is supposed to afford "considerable deference" to the Board's interpretation of the INA, but to be "more stringent with respect to the other statutes that Congress has not committed to the Board's charge." Maj. Op. at 54.

In my view, this standard of review is too deferential, and is likely to prove unworkable. The remedy given by the Board in this case necessarily entails a reading of a statute that is outside the Board's field of expertise. The question therefore should not be wheth-

er the Board reconciled the statutes in a way that is "reasonable"; the proper question is whether the Board's remedy is tailored to avoid any conflict between the NLRA and the requirements of another federal legislative scheme. *See Sure–Tan Inc. v. NLRB,* 467 U.S. 883, 903, 104 S.Ct. 2803, 2814, 81 L.Ed.2d 732 (1984).

I believe that the Board's remedy fails under either standard: insofar as the Board awards backpay to undocumented aliens who are not lawfully available for work, the remedy is neither reasonable nor sufficiently tailored to avoid any conflict with the immigration laws. The NLRB opinion and the majority opinion solicitously preserve and reinforce the economic incentives for employers to comply with the labor laws, but do so without full appreciation of or equal effort to promote the economic incentives to obey the immigration laws. Thus the labor law dog wags the immigration law tail.

### B

The principle that should decide this appeal is articulated in *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), and confirmed by Congress' subsequent enactment of IRCA: An undocumented worker is not available for work, and therefore is not eligible for an award of backpay, for any period during which that worker's employment was contrary to the immigration laws.

In *Sure–Tan,* the order under review directed the employer to reinstate undocumented workers and pay them six months' backpay. However, because the workers had left the country, the relief was conditioned on their legal readmittance into the country. The Supreme Court held that the NLRA applied to undocumented aliens, and empha-

sized that there was no conflict between the NLRA and the immigration laws *at that time,* because "[f]or whatever reason, Congress ha[d] not adopted provisions in the INA making it unlawful for an employer to hire an alien who is present or working in the United States without appropriate authorization." *Id.* at 892–93, 104 S.Ct. at 2808–09. The Court also ruled that any remedies available to undocumented aliens under the NLRA must be sufficiently tailored to avoid conflicts with the immigration laws. *Id.* at 891–94, 903, 104 S.Ct. at 2808–10, 2811;.

Applying these principles, the Court confirmed the Board's power to order reinstatement, but held that such an offer "must be conditioned upon the employees' legal readmittance to the United States" in order to avoid "a potential conflict with the INA." *Id.* at 903, 104 S.Ct. at 2814. The Court also upheld the power of the Board to award backpay to undocumented workers, but declared that, "in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." *Id.* The controlling principle laid down in *Sure–Tan* is that an alien is not entitled to backpay unless the worker is *"lawfully available for employment* during the backpay period," *id.* at 904, 104 S.Ct. at 2815 (emphasis added).[1]

Before the advent of IRCA in 1986, the Circuits split in their reading of *Sure–Tan.* The Ninth Circuit decided that *Sure–Tan* turned on the fact that the aliens had left the country, and that the case did not prohibit backpay to undocumented aliens who stayed inside the United States after illegal termination. *Local 512, Warehouse and Office Workers' Union v. NLRB,* 795 F.2d 705 (9th Cir.1986) (*"Felbro"*). The court reasoned

---

1. This principle is consistent with the cases that uphold backpay awards to underage or unlicensed discriminatees. *See, e.g., Justrite Mfg. Co.,* 238 N.L.R.B. 57 (1978) (underage discriminatee); *New Foodland, Inc.,* 205 N.L.R.B. 418 (1973) (same); *Robinson Freight Lines,* 129 N.L.R.B. 1040 (1960) (unlicensed truck driver); *Local 57, International Union of Operating Engineers,* 108 N.L.R.B. 1225 (1954) (unlicensed engineer). The NLRB's opinion in the present matter and its brief before this Court rely upon these

cases to argue that backpay can be awarded "despite a legal disability … that render[s] the discriminatorily discharged employee unable to work legally." 320 N.L.R.B. 408, 412 & n. 26. However, in each of those cases, the employment relationship itself was legal, and the employees were legally employable during the backpay period notwithstanding the fact that they were disqualified from performing the tasks and responsibilities for which they were primarily hired.

that *Sure–Tan* was mainly concerned with the INA's prohibition on illegal *entry* (in supposed contradistinction to illegal presence), and that an award of backpay to undocumented workers who never left would not induce an illegal entry. The Ninth Circuit explicitly acknowledged, however, that (at that time) the INA contained no provision making the employment of an unauthorized alien unlawful. *Felbro,* 795 F.2d at 719.

The Seventh Circuit rejected this narrow interpretation of *Sure–Tan,* holding instead that the Court plainly barred any award of backpay for any period in which an alien was undocumented regardless of whether they remained within the borders of the United States. *Del Rey Tortilleria, Inc. v. NLRB,* 976 F.2d 1115, 1120–22 (7th Cir.1992). The Seventh Circuit noted that the case before it arose prior to the enactment of IRCA, but indicated in dictum that IRCA—by prohibiting the employment of undocumented aliens—would "clearly" bar an award of backpay to undocumented workers wrongfully discharged after its enactment. *Id.* at 1122.

Although this Court has not previously interpreted *Sure–Tan* in the context of a backpay order under the NLRA, we have done so in the context of a claim for backpay under Title VII. In *Rios v. Enterprise Ass'n Steamfitters Local Union 638,* 860 F.2d 1168, 1172 n. 2 (2d Cir.1988), we recognized that "the law in this area has changed with the passage of [IRCA]," but did not consider the statute's impact because the events in that case transpired before IRCA's effective date. Instead, we interpreted *Sure–Tan* in much the same way the Ninth Circuit did in *Felbro,* and concluded that the claimants were eligible for backpay under Title VII as of the date of the violation (i) because they had not left the country during the backpay period, and (ii) because—*at that time*—their employment "*would have violated no immigration law.*" *Id.* at 1173 (emphasis added).

IRCA healed the circuit split. By prohibiting an employer from hiring an undocumented alien, Congress altered the premise that underlay the Ninth Circuit's decision in *Felbro, see* 795 F.2d at 719, as well as our own decision in *Rios, see* 860 F.2d at 1173. Both Circuits have acknowledged that the 1986 enactment of IRCA may preclude an award of backpay to undocumented aliens. *See EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1517 n. 11 (9th Cir.1989) (IRCA "may well ... change[ ] the mix of policy considerations underlying the case law which supports our conclusion that undocumented employees may recover back pay in a Title VII action."); *Rios,* 860 F.2d at 1172 n. 2.

The majority opinion fails to explain how awarding backpay to undocumented aliens—which was permissible only because there was no outright prohibition on their employment—can withstand IRCA, which effects such a prohibition. The majority concedes merely that IRCA "changed the INA's silence with respect to the employment of illegal aliens," and thereby altered "a significant element of the holdings of *Sure–Tan, Felbro,* and *Rios.*" *See,* Maj. Op. at 55. If saying that the "silence" was "changed" means that Congress has spoken, I agree, and I would decide that case on the basis of what Congress said.[2]

The majority goes on to argue, however, that a House Judiciary Committee Report regarding IRCA "demonstrates the intention to preserve the NLRA's protection of and remedies for undocumented workers." Maj. Op. at 55. Assuming that a committee report can or is needed to explicate what Congress has done in IRCA, there is no basis for the majority's conclusion that the reference to the Board's "powers ... to remedy unfair practices committed against undocumented employees," *see* Maj. Op. at 56, quoting H.R.Rep. No. 99–682(I) (1986) at 58, reprinted in 1986 U.S.C.C.A.N. 5649, 5662, includes the power to award backpay. As the majority admits in another part of its opinion, there seems to be "[n]othing in [IRCA] or its legis-

2. The NLRB reads IRCA as I do:

    Under provisions of IRCA, an employer who knowingly hires an "unauthorized alien" after November 6, 1986, is subject to criminal sanctions. *Employers must also obtain verification*

*from employees hired after November 6, 1986, that they are lawfully present and available for employment in the United States.*
NLRB Casehandling Manual § 10546.7 (emphasis added).

lative history suggesting Congress preferred either the Seventh or Ninth Circuit's understanding of *Sure–Tan.*" Maj. Op. at 58. In the absence of any such evidence, the legislative history cited by the majority (if useful to begin with) is simply inconclusive.

It is indisputable that under IRCA the employment of an undocumented alien is now illegal. It closely follows that an undocumented alien is not *"lawfully* available for employment," *Sure–Tan,* 467 U.S. at 904, 104 S.Ct. at 2815 (emphasis added), and therefore is not eligible for any award of backpay in any period during which that alien lacks work authorization, *id.* at 903, 104 S.Ct. at 2814–15. To hold otherwise creates a direct conflict between IRCA and the NLRA; and the Supreme Court has warned that any remedies available to undocumented workers under the NLRA must be tailored to avoid any conflict with the immigration laws. *Id.*

### C

The majority enforces the NLRB's order that backpay be paid from the date of discharge to the earlier of (i) the date on which the worker can be legally employed under the immigration laws and is reinstated, or (ii) the date on which some reasonable period of time has expired (following the remedial order) in which the worker may pursue such normalization of status. That remedy is foreclosed by *Sure–Tan* and IRCA, for the reasons set forth in section B. But the majority forcefully demonstrates that a backpay

---

**3.** The majority argues (and I agree) that the failure to award *any* backpay in cases of this kind would (1) "increase the incentives for employers to hire undocumented aliens," thereby undermining the purpose of the IRCA; and (2) "make undocumented workers an easy target for employers resisting union organization, and, thus, frustrate the rights of lawful U.S. workers under the NLRA." Maj. Op. at 57–58.

**4.** The majority's approach subverts and contradicts the immigration laws by compensating Benavides and Guzman for prolonging their illegal residence in this country. Thus they may become entitled to years of salary (depending on how the NLRB computes the award), but would qualify for nothing (under the rule of *Sure–Tan*) if they had respected United States immigration law by returning to their countries. Considering

remedy is required in order to vindicate the important public purposes of the labor laws and the immigration laws, chiefly to avoid affording perverse incentives for rogue employers to hire undocumented aliens.[3] It is possible, however, to give full play to the labor laws as well as the immigration laws by an award of backpay commencing on the date that the alien obtains authorization to work in the United States and thus becomes "lawfully available for employment," *Sure–Tan,* 467 U.S. at 904, 104 S.Ct. at 2815, and continuing until the date of reinstatement. Unlike the remedy upheld by the majority, this solution is closely tailored to the verification requirements of IRCA, serves the policy goals of both IRCA and the NLRA, and—at the same time—encourages people to respect and comply with the immigration laws of the United States.[4] Specifically, employer liability for backpay commencing on the date an alien obtains lawful employment status preserves a backpay remedy, thus deterring employers from hiring undocumented aliens in order to use them as pawns to resist unionization, and at the same time encourages undocumented aliens to achieve lawful presence and seek lawful employment status under the immigration laws without delay.

---

that NLRB proceedings can span a whole decade, this is no small inducement to prolong illegal presence in the country.

The poor fit between the labor laws and the immigration laws (as the majority construes them) is further illustrated by an employee's obligation to mitigate damages, a duty recognized by the Supreme Court in *Sure–Tan,* 467 U.S. at 901, 104 S.Ct. at 2813–14, but that cannot be performed by an undocumented alien without causing further violation of the immigration laws.

Some of the adverse effects of the majority's ruling should be mitigated, however, because there seems to be no reason an employer cannot toll the accrual of backpay by offering reinstatement on the condition (among other required conditions) that the worker get square with the INS.