HOFFMAN PLASTIC COMPOUNDS,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 98–1570.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 13, 1999.

Decided March 17, 2000.

Order Granting Rehearing En
Banc June 16, 2000.

Maurice Baskin argued the cause and filed the briefs for petitioner.

Sharon Block, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Fred L. Cornnell, Attorney. John D. Burgoyne, Deputy Associate General Counsel, entered an appearance.

Marsha S. Berzon argued the cause for amicus curiae American Federation of Labor and Congress of Industrial Organizations. With her on the brief were Jonathan P. Hiatt and James B. Coppess.

Before: SENTELLE, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Dissenting opinion filed by Circuit Judge SENTELLE.

TATEL, Circuit Judge:

Petitioner illegally fired several workers in retaliation for attempting to organize a union. Finding multiple unfair labor practices, the National Labor Relations Board ordered its traditional remedy, reinstate-

ment with backpay, for all discharged employees. When the Board learned that one of these employees was an undocumented alien, it denied him reinstatement and terminated his backpay as of the date the employer discovered he was unauthorized to work. Challenging even this reduced award, the employer claims that awarding any backpay to undocumented workers conflicts with immigration law. Because the Supreme Court has held that undocumented workers are protected by the National Labor Relations Act, and because the limited remedy awarded here is within the Board's discretion and furthers the purposes of both labor and immigration law, we deny the petition for review and grant the cross-application for enforcement.

## I

■ This case lies at the intersection of two statutory schemes: labor and immigration. Enacted in 1935, the National Labor Relations Act encourages collective bargaining, promotes industrial peace, and protects workers' rights of association, self-organization, and representation. *See, e.g., Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 182–85, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). The statute vests the NLRB with broad discretion to enforce the Act and to remedy unfair labor practices. *See* 29 U.S.C. § 160(c). Not limited to "the correction of private injuries" or the "adjudication of private rights," the Board "acts in a public capacity to give effect to the declared public policy of the Act." *Phelps Dodge,* 313 U.S. at 192–93, 61 S.Ct. 845. "Making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces." *Id.* at 197, 61 S.Ct. 845. Awards of backpay not only make discriminatees whole, but "also achieve a public purpose by deterring future similar unlawful practices, and by depriving employers of any competitive advantage they may have secured by acting unlawfully." *Local 512, Warehouse and*

*Office Workers' Union v. NLRB,* 795 F.2d 705, 718 (9th Cir.1986) ("*Felbro*").

Like the NLRA, the nation's immigration laws preserve jobs and safeguard American workers' wages and employment conditions. *See INS v. National Ctr. for Immigrants' Rights,* 502 U.S. 183, 194 & n. 8, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991); *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 893, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984). Until 1986, the Immigration and Nationality Act was primarily concerned "with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Sure-Tan,* 467 U.S. at 892, 104 S.Ct. 2803 (quoting *DeCanas v. Bica,* 424 U.S. 351, 359, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976)). The Immigration Reform and Control Act of 1986 focused new immigration control efforts on employers. The Act makes it unlawful to employ anyone *known* to be an unauthorized alien, requires employers to verify and document the work eligibility of new hires, and authorizes sanctions against employers who violate the Act. *See* 8 U.S.C. § 1324a.

■ The NLRB and the courts have sought to ensure that labor and immigration laws operate in tandem. They have held that all employees, regardless of immigration status, have the right to organize and are entitled to protection from unfair labor practices. In *Sure-Tan,* for example, the Supreme Court affirmed a Board decision that extended the protections of the NLRA to undocumented workers. In addition to relying on the text of the Act, which broadly defines covered employees, the Court pointed to the common policies driving both labor and immigration law:

> Application of the NLRA [to undocumented workers] helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment. If an employer realizes that there will be no

advantage under the NLRA in preferring illegal aliens to legal resident workers, any incentive to hire such illegal aliens is correspondingly lessened. In turn, if the demand for undocumented aliens declines, there may then be fewer incentives for aliens themselves to enter in violation of the federal immigration laws.

467 U.S. at 893–94, 104 S.Ct. 2803. According to the Court, protecting undocumented aliens from unfair labor practices not only is "clearly reconcilable with," but indeed "serves the purposes of," the immigration laws. *Id.* at 894, 104 S.Ct. 2803; *see also NLRB v. Kolkka,* 170 F.3d 937, 940 (9th Cir.1999). At the same time, the Court emphasized that while the NLRA protects undocumented workers, the Board's remedies for unfair labor practices must not conflict with immigration law. *See Sure–Tan,* 467 U.S. at 902, 104 S.Ct. 2803.

Petitioner Hoffman Plastic Compounds, Inc. manufactures custom-formulated polyvinylchloride pellets for use by customers who produce pharmaceutical, construction, and household products. In May, 1988, José Castro began working in Hoffman's production plant earning minimum wage as a compounder, an operator of large blending machines that mix and cook the plastic formulas ordered by customers. When the United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO began an organizing drive at Hoffman's factory, Castro, along with several other employees, distributed union authorization cards to coworkers. After what the Board later described as "coercive and restraining" interrogation of union supporters, Hoffman laid off each employee who had engaged in organizing activities, including Castro. *Hoffman Plastic Compounds, Inc.,* 306 N.L.R.B. 100 (1992).

When Hoffman received notice from the NLRB that the Union had filed a representation petition, it made some attempt to recall the discharged workers. A March 10, 1989 letter from Hoffman to Castro stated, "[i]t looks like we'll need a few men soon," and asked him to contact his former supervisor "no later than 4 P.M., Monday, March 13, 1989." *Hoffman Plastic Compounds, Inc.,* 326 NLRB No. 86 (1998). Castro never responded.

After one of the discharged employees filed charges with the Board, an Administrative Law Judge found that Hoffman had engaged in multiple unfair labor practices. The Board adopted the ALJ's findings, concluding not only that the company had unlawfully interrogated employees about their union activities and sympathies, but that "in order to rid itself of known union supporters, [Hoffman] discriminatorily selected union adherents for layoff" in violation of Sections 8(a)(1) and (3) of the NLRA, 29 U.S.C. 158(a)(1), (3). *Hoffman Plastic,* 306 N.L.R.B. at 100. The Board ordered Hoffman to cease and desist from such unfair labor practices, to post a notice at the work site, and to reinstate and make whole those union supporters it had illegally fired.

When a dispute arose as to the proper computation of backpay, a compliance proceeding was held before another ALJ. Castro appeared at the hearing, testifying through an interpreter. When Hoffman's attorney began to question Castro about his citizenship and authorization to work in the United States, the Board's General Counsel objected. The ALJ sustained the objection, but not before Castro had stated that he was a Mexican national and that the birth certificate he had used to gain employment at Hoffman was borrowed from a friend. On the basis of this admission, the ALJ recommended neither reinstatement nor backpay for Castro. *See Hoffman Plastic Compounds, Inc.,* 314 N.L.R.B. 683, 685 (1994).

While the ALJ's recommendation was under consideration by the NLRB, the Board decided another case involving undocumented discriminatees, *A.P.R.A. Fuel Oil Buyers Group,* 320 N.L.R.B. 408 (1995), *enforced* 134 F.3d 50 (2d Cir.1997). There, the Board modified its standard

remedy of reinstatement with backpay to account for the fact that the illegally fired workers lacked documentation. The Board conditioned its reinstatement order on the discriminatees' ability to verify their eligibility to work. It also ordered that the backpay period terminate either when the discriminatees were lawfully reinstated or when they failed to produce the necessary employment eligibility documents within a reasonable period of time.

Issuing its Second Supplemental Decision and Order in this case, the Board adapted the remedy it had developed in *A.P.R.A. Fuel* to Castro's situation, denying reinstatement due to his undocumented status and awarding only limited backpay. *See Hoffman Plastic Compounds, Inc.*, 326 NLRB No. 86 (1998). To determine the backpay period, the Board first considered whether Hoffman's "[i]t looks like we'll need a few men soon" letter amounted to a specific and unequivocal offer of reinstatement that would toll backpay. Answering this question in the negative, the Board nonetheless allowed Hoffman the benefit of the after-acquired evidence defense and terminated the backpay period as of June 14, 1993, the date Hoffman learned that Castro had misrepresented his immigration status.

Hoffman now petitions for review of the Board's final order. The company does not challenge the Board's findings that it illegally discharged known union organizers and committed other unfair labor practices. It contests only Castro's limited backpay award, arguing that 1) *Sure-Tan* holds that undocumented aliens may never be awarded backpay; 2) IRCA prohibits backpay awards to undocumented workers; and 3) the Board misapplied the after-acquired evidence rule and violated the equal protection guarantee of the Fifth Amendment by giving undocumented workers preferential treatment. Cross-petitioning for enforcement, the NLRB, supported by amicus AFL–CIO, responds that the award of limited backpay to Castro is prohibited by neither *Sure-Tan* nor IRCA

and falls well within the Board's broad remedial discretion. Indeed, the Board contends, the limited backpay award furthers the purposes of both labor and immigration law.

Before considering these issues, we register our disagreement with Hoffman's characterization of this case as a dispute between "an innocent employer" and an employee who has no legal right to be in this country and who obtained his job through fraud. To be sure, the Board did find the evidence insufficient to conclude that Hoffman violated IRCA by hiring Castro knowing him to be an unauthorized alien. At the same time, however, the Board found that Hoffman had committed multiple unfair labor practices by interrogating, intimidating, and ultimately discharging union supporters. Hoffman neither contests these findings nor disputes that it failed to comply with the Board's order to reinstate Castro before his ineligibility for employment became known, when to do so would have ended the company's backpay liability without violating IRCA. *See* 8 C.F.R. § 274a.2(b)(viii)(A)(3), (5) (exempting employer from re-verifying an employee's eligibility for continuing employment after a temporary layoff or reinstatement after unjustified suspension or wrongful termination). And while it is true that Castro lied when falsely attesting to his work eligibility on the I–9 form and when identifying himself as "José Castro" in his sworn testimony at the compliance proceeding, the Supreme Court has held that a discriminatee's dishonesty does not preclude an award of backpay to remedy unfair labor practices. *See ABF Freight System, Inc. v. NLRB*, 510 U.S. 317, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994). Moreover, Castro's use of another's birth certificate to obtain employment did not violate IRCA at that time. *See* Immigration Act of 1990, Pub.L. No. 101–649, § 544, 104 Stat. 4978, 5059 (1990), codified at 8 U.S.C. § 1324c(a)(3) (amending IRCA to prohibit the use of documents issued to a person other than

the possessor). Thus the precise issue before us is this: Did Castro's undocumented status—as opposed to his lying about it—render him entirely ineligible to obtain backpay as a remedy for Hoffman's serious and undisputed violations of the National Labor Relations Act?

## II

We begin with Hoffman's argument, embraced by our dissenting colleague, that this case is controlled by a single sentence from the Supreme Court's opinion in *Sure-Tan v. NLRB*: "[I]n computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." *Sure-Tan*, 467 U.S. at 903, 104 S.Ct. 2803. This sentence, Hoffman claims, "plainly prohibits" the NLRB from awarding even limited backpay to undocumented workers victimized by unfair labor practices. Read literally and divorced from its context, the sentence could well be interpreted to support that view. But determining whether particular Supreme Court language amounts to binding precedent is not so simple. The Court itself has warned against "dissect[ing] the sentences of the United States Reports as though they were the United States Code." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Instead, we must read the allegedly controlling sentence in context, taking account of the facts of the case, the issues presented, and the Court's reasoning and holding. "The Court's every word and sentence cannot be read in a vacuum; its pronouncements must be read in light of the holding of the case and to the degree possible, so as to be consistent with the Court's apparent intentions and with other language in the same opinion." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C.Cir. 1998) (en banc). With this perspective in mind, and with the Court's entire backpay discussion at our fingertips (*see* Appendix A)—the sentence on which Hoffman relies appears in the penultimate paragraph—we turn to the task of elucidating *Sure-Tan* and determining whether it controls this case.

The employer in *Sure-Tan* attempted to invalidate a union election by notifying the Immigration and Naturalization Service that several employees were undocumented. In response, the INS arrested five of the workers, all of whom agreed to return to Mexico to avoid deportation. "By the end of the day, all five employees were on a bus ultimately bound for Mexico." *Sure-Tan*, 467 U.S. at 887, 104 S.Ct. 2803.

An ALJ found that the employer had violated the NLRA by constructively discharging its undocumented workers in retaliation for their union support. Because the ALJ thought that the discriminatees' return to Mexico rendered reinstatement "at best an unlikely prospect," he recommended holding the reinstatement offers open for six months to permit them to return lawfully. And since their absence from the country left the discriminatees "unavailable for employment" and therefore ineligible for backpay under standard NLRB policy, the ALJ suggested a minimum award of four weeks pay to each discriminatee to provide some measure of compensation for the discharged employees and to deter the employer. *Sure-Tan, Inc.*, 234 N.L.R.B. 1187, 1192 (1978).

Although the Board agreed that the company had violated the NLRA, it rejected the ALJ's recommended minimum remedy as "unnecessarily speculative" because no evidence supported his assumption that the discriminatees were not already back in the country and once again available for work. *Id.* at 1187. The Board instead ordered its usual remedy of reinstatement with backpay, leaving for a future compliance proceeding the determination of each employee's availability for work and the calculation of backpay. *Id.* In doing so, the Board reiterated two standard rules: "[t]he backpay period runs from the dis-

criminatory loss of employment to the bona fide reinstatement offer," and discriminatees "found to be unavailable for work (including unavailability because of enforced absence from the country) will have their backpay tolled accordingly." *Sure-Tan, Inc.*, 246 N.L.R.B. 788, 788 (1979). One dissenting member urged the Board to "clarify" that reinstatement offers should be available only to discriminatees who reenter the country lawfully. *Id.* at 791. A second dissenter urged that the backpay period run only from the date of the constructive discharge to the date the discriminatees left the country. *Id.*

The Seventh Circuit upheld the Board's decision and enforced its order, with a few modifications. To guard against the possibility that the discriminatees "might be motivated to reenter the United States unlawfully to claim reinstatement and backpay," *NLRB v. Sure–Tan, Inc.*, 672 F.2d 592, 603 (7th Cir.1982), the court directed that the reinstatement offers be made conditional upon legal re-entry, that they be sent in Spanish by verified delivery to the discriminatees' addresses in Mexico, and that they remain open for at least four years to afford the workers an opportunity to return lawfully and reclaim their jobs. *See id.* at 606. Using language later adopted by the Supreme Court and now relied on by Hoffman, the court also modified the Board's order by stating that "in computing backpay discriminatees will be deemed unavailable for work during any period when not lawfully entitled to be present and employed in the United States." *Id.* Sharing the ALJ's concern that the discriminatees, having left the country immediately after their discharge with no prospect of lawful return, might receive no backpay at all, thus leaving them uncompensated and the employer undeterred, and echoing the ALJ's original suggested minimum backpay award, the court directed the Board to modify the order to include a minimum award of six months' backpay to each discharged worker. Six months, the court said, represented an estimate of the minimum time "during which the discriminatees might reasonably have remained employed without apprehension by INS, but for the employer's unfair labor practice." *Id.*

The Supreme Court agreed with the Board and the Seventh Circuit that undocumented workers are protected by the NLRA. It also agreed that the employer, by notifying the INS of the workers' immigration status, had committed an unfair labor practice. *Sure-Tan*, 467 U.S. at 895–96, 104 S.Ct. 2803. Then, turning to the question of remedy, and repeatedly emphasizing the broad deference due the NLRB, the Court affirmed the Board's original order in all respects. Even a cursory review of the Court's discussion—readers might want to pause and read it for themselves (*see* Appendix A)—reveals that 1) whether undocumented workers are eligible to receive backpay was not an issue before the Court and 2) the only backpay issue the Court considered was whether the six-month minimum award imposed by the Seventh Circuit was an unduly speculative estimate "not sufficiently tailored to the actual, compensable injuries suffered by the discharged employees." *Id.* at 901, 104 S.Ct. 2803. At the very outset of its discussion, the Court states: "Petitioners attack those portions of the Court of Appeals' order which modified the Board's original order by providing for an *irreducible minimum* of six months' backpay for each employee and by detailing the language, acceptance period, and verification method of the reinstatement offers." *Id.* at 898 (emphasis added). Notice that the Court nowhere says that the employer argued, as does Hoffman, that the discriminatees were ineligible to receive backpay simply because they were undocumented. Notice also that the Court describes the sentence on which Hoffman places so much emphasis as merely repeating a limitation on backpay imposed by the Seventh Circuit, an issue that was neither challenged nor briefed by either the Board or the employer:

Conditioning the offers of reinstatement on the employees' legal reentry and deeming the employees "unavailable" during any period when they were not lawfully present are requirements that were in fact imposed by the Court of Appeals in this case, and hence fully accepted by the Board.... The Board has clearly indicated its agreement with these portions of the Court of Appeals' remedial order by specifically noting that petitioners do not challenge these parts of the order [and] by limiting its own argument to the minimum backpay award issue alone....

*Id.* at 903 n. 12, 104 S.Ct. 2803. *See also id.* at 898 n. 8, 104 S.Ct. 2803; *Del Rey Tortilleria, Inc. v. NLRB,* 976 F.2d 1115, 1123 (7th Cir.1992) (Cudahy, J., dissenting). The sentence on which Hoffman relies was not even an issue before the Court.

Moreover, in setting aside the Seventh Circuit's six-month minimum award, the Court made clear that, contrary to Hoffman's argument, undocumented workers may receive backpay. To begin with, the Court said that it "generally approve[s] the Board's original course of action in this case by which it ordered the conventional remedy of reinstatement with backpay, leaving until the compliance proceeding more specific calculations as to the amounts of backpay, if any, due these employees." *Sure-Tan,* 467 U.S. at 902, 104 S.Ct. 2803. The Court explained that the discriminatees could receive backpay despite their illegal status so long as the amount reflected the actual time they might have continued working but for the employer's unfair labor practice. The Court did not fault the Seventh Circuit for awarding backpay to undocumented workers, nor for basing the award on the "minimum time during which the discriminatees might reasonably have remained employed without apprehension by INS, but for the employer's unfair labor practice." *Id.* at 899, 104 S.Ct. 2803 (internal quotation marks omitted). Instead, the Court held

that the Seventh Circuit erred by picking the six-month period out of thin air. The "main deficiency" in the Seventh Circuit's order, the Court explained, was not that it awarded backpay to undocumented aliens, but that the *amount* of backpay awarded was "develop[ed] in the total absence of any record evidence as to the circumstances of the individual employees," thus violating the "cardinal" proposition "that a backpay remedy must be sufficiently tailored to expunge only the *actual,* and not merely *speculative,* consequences of the unfair labor practices." *Id.* at 899–900 & n. 9, 104 S.Ct. 2803. The Court continued:

[T]he Court of Appeals "estimated" an appropriate period of backpay without any evidence whatsoever as to the period of time these particular employees might have continued working before apprehension by the INS and without affording petitioners any opportunity to provide mitigating evidence. In the absence of relevant factual information or adequate analysis, it is inappropriate for us to conclude, as does JUSTICE BRENNAN, that the Court of Appeals had estimated the proper minimum backpay award "with a fair degree of precision."

*Id.* at 901 n. 11, 104 S.Ct. 2803. If as Hoffman argues undocumented workers may never be awarded backpay, the Court would not have mentioned "the proper minimum backpay award," "the period of time these particular employees might have continued working before apprehension by the INS," or "affording petitioners any opportunity to provide mitigating evidence." Nor would there have been any need for more "relevant factual information or adequate analysis," much less for a compliance proceeding to determine the amount of backpay actually due.

In light of the fact that *Sure–Tan* does not bar undocumented workers from receiving backpay, what are we to make of the sentence on which Hoffman and our dissenting colleague place so much emphasis? The answer is that the Court intended the sentence to guide the Board on

remand in dealing with the unique circumstances of the *Sure-Tan* employees. Recall that the *Sure-Tan* discriminatees, unlike Castro, had left the country. Having approved the Board's general order of reinstatement with backpay, and having remanded for compliance proceedings to calculate the amount of backpay due, the Court went on to agree with the Seventh Circuit that whatever specific remedy the Board might formulate must not encourage the discriminatees to re-enter the country illegally. The INA's "central concern," the Court pointed out, was regulating "admission to the country." *Id.* at 892, 104 S.Ct. 2803. The Court therefore added the paragraph in which Hoffman's sentence appears:

> [A]s the Court of Appeals recognized, the implementation of the Board's traditional remedies at the compliance proceedings must be conditioned upon the employees' legal readmittance to the United States. In devising remedies for unfair labor practices, the Board is obliged to take into account another equally important Congressional objective—to wit, the objective of deterring unauthorized immigration that is embodied in the INA. By conditioning the offers of reinstatement on the employees' legal reentry, a potential conflict with the INA is thus avoided. *Similarly, in computing backpay, the employees must be deemed "unavailable" for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States.*

*Id.* at 902–03, 104 S.Ct. 2803 (emphasis added) (internal quotation marks and citation omitted). Notice that the first sentence refers to "the employees' legal readmittance to the United States." *Id.* at 903, 104 S.Ct. 2803. The second sentence mentions "deterring unauthorized immigration." *Id.* The third again refers to "the employees' legal reentry." *Id.* So when in the final sentence the Court mentions employees "not lawfully entitled to be present and employed in the United

States," it must be referring only to *those particular* Sure–Tan employees who had left the country and could not lawfully return.

Indeed, the sentence makes sense only *because* the *Sure-Tan* discriminatees had left the country. As the Court itself pointed out, although the employees were illegally present in the United States while working for the company, it was not unlawful for the company to have employed them. *Id.* at 892–93, 104 S.Ct. 2803. Because their employment was not prohibited, it cannot be said that they were "not lawfully entitled to be present *and employed* in the United States." Not until the discriminatees left the country—at which point they could not have been reinstated without reentering in violation of immigration law—did they become "not lawfully entitled to be *present and employed* in the United States." And for the same reason, not until they left the country did the discriminatees lose their "legal availability for work." *Id.* at 904, 104 S.Ct. 2803.

To sum up, in light of *Sure-Tan's* reasoning and its holding that undocumented workers are protected by the NLRA and may in fact receive properly tailored awards of backpay, we must reject Hoffman's interpretation of the sentence. Reading it to bar all backpay to undocumented workers would expand a snippet of dictum well beyond the unique facts of *Sure-Tan* to create a blanket rule that, in addition to conflicting with *Sure-Tan* itself, would undermine the purposes of both immigration and labor law. *See infra* at 241–42. What we said in *Aka*, where we also refused to adopt "an unqualifiedly literal reading" of an isolated passage from a Supreme Court opinion, applies here as well: Hoffman's interpretation "would not carry out the Court's true purpose." 156 F.3d at 1291. Read properly, the sentence simply reminds the Board that the remedies it fashions for unfair labor practices

must not encourage violations of immigration law.

Two of the three Circuits that have addressed this issue agree with our interpretation of *Sure-Tan.* In *Felbro,* the Ninth Circuit stated: "In *Sure-Tan,* the Supreme Court did not address the issue whether undocumented workers remaining at work in the United States throughout the backpay period are entitled to backpay awards. *Sure-Tan* barred from backpay only those undocumented workers who were unavailable for work in the backpay period because they were outside the United States without entry papers." 795 F.2d at 722. To be sure, in a later case also upholding an award of backpay to undocumented workers, the Ninth Circuit added a footnote speculating whether the enactment of IRCA might "change[] the mix of policy considerations underlying the case law which supports our conclusion that undocumented employees may recover backpay." *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1517 n. 11 (9th Cir.1989). As we explain in the following section, however, IRCA's enactment did not alter the labor and employment law protections afforded undocumented workers. The Ninth Circuit, moreover, has never repudiated *Felbro*'s and *Hacienda Hotel*'s holdings that backpay can be awarded to undocumented workers. Indeed, the Ninth Circuit and its district courts have consistently reaffirmed that undocumented workers continue to be protected by labor and employment laws after IRCA and have continued to award them backpay. *See, e.g., Kolkka,* 170 F.3d 937; *Contreras v. Corinthian Vigor Ins. Brokerage, Inc.,* 25 F.Supp.2d 1053 (N.D.Cal.1998); *Escobar v. Baker,* 814 F.Supp. 1491, 1498 (W.D.Wash.1993); *EEOC v. Tortilleria "La Mejor,"* 758 F.Supp. 585 (E.D.Cal.1991). Likewise, in *A.P.R.A. Fuel,* the Second Circuit held that *Sure-Tan* bars awards of backpay only to those undocumented employees who are unavailable for work because they are outside the country and unable to lawfully reenter. *See A.P.R.A. Fuel,* 134 F.3d at 54–55. *But see Del Rey Tortilleria,* 976

F.2d at 1120–21 (interpreting *Sure-Tan* as imposing a blanket prohibition on backpay awards to undocumented workers).

\* \* \*

Hoffman next argues that even if *Sure-Tan* does not bar backpay to undocumented aliens, the Immigration Reform and Control Act of 1986 does. IRCA, it will be recalled, "establishe[d] penalties for employers who *knowingly* hire undocumented aliens, thereby ending the magnet that lures them to this country." H.R.Rep. No. 99–682(I) at 45–46 (1986), reprinted in 1986 U.S.C.C.A.N. 5649–50 (emphasis added). In addition to employer sanctions, *see* 8 U.S.C. § 1324a(a), IRCA establishes procedures by which employers must verify employee eligibility to work, *see* 8 U.S.C. § 1324a(b), and makes it unlawful for employers to discriminate against authorized workers on the basis of citizenship or national origin, *see* 8 U.S.C. § 1324b. Because undocumented workers "live in fear, afraid to seek help when their rights are violated, when they are victimized by criminals, employers or landlords," IRCA established amnesty procedures to legalize the status of undocumented workers illegally present in the country, allowing them "to contribute openly to society and ... help[ing] to prevent the exploitation of this vulnerable population in the work place." H.R. Rep. 99–682(I) at 49, 1986 U.S.C.C.A.N. at 5653.

According to Hoffman, "the plain intent of IRCA" was to prevent the Board from awarding undocumented workers backpay. The Board interprets IRCA differently. It argues that far from barring backpay awards, IRCA preserves the NLRA's "protections and remedies for undocumented aliens as one of many useful tools in a multifaceted strategy" to reduce illegal immigration by aiming at its "economic roots."

Two principles guide our consideration of this issue. First, while the Board's formulation of remedies for NLRA violations merits the highest level of defer-

ence, *see ABF Freight*, 510 U.S. at 324, 114 S.Ct. 835, we owe no deference to its interpretation of IRCA. *See, e.g., New York Shipping Ass'n v. Federal Maritime Comm'n*, 854 F.2d 1338, 1365 (D.C.Cir. 1988) (agency interpretation of a statute it does not administer is entitled to no deference). Second, in enforcing the NLRA, the Board may not

> ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task.

*Southern Steamship Co. v. NLRB*, 316 U.S. 31, 47, 62 S.Ct. 886, 86 L.Ed. 1246 (1942). If a conflict requires the Board "to accommodate the policies of another statutory regime within the framework of the legislation it administers," it "must fully enforce the requirements of its own statute, but must do so, insofar as possible, in a manner that minimizes the impact of its actions on the policies of the other statute." *New York Shipping*, 854 F.2d at 1367. "[A]n agency, faced with alternative methods of effectuating the policies of the statute it administers, (1) must engage in a careful analysis of the possible effects those alternative courses of action may have on the functioning and policies of other statutory regimes, with which a conflict is claimed; and (2) must explain why the action taken minimizes, to the extent possible, its intrusion into policies that are more properly the province of another agency or statutory regime." *Id.* at 1370. This is precisely what the Board has done.

To begin with, we agree with the Board that nothing in IRCA bars awards of limited backpay to remedy unfair labor practices against undocumented workers. Hoffman itself acknowledges that IRCA neither amends nor repeals the NLRA or any other labor law. The House Judiciary Committee Report, moreover, expressly states that IRCA's employer sanctions provisions are not intended to

> be used to undermine or diminish in any way labor protections in existing law, or to limit the powers of federal or state labor relations boards, labor standards agencies, or labor arbitrators to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by existing law. In particular, the employer sanctions provisions are not intended to limit in any way the scope of the term "employee" in Section 2(3) of the [NLRA], as amended, or of the rights and protections stated in Sections 7 and 8 of that Act.

H.R. Rep. 99–682(I) at 58, 1986 U.S.C.C.A.N. at 5662. The Judiciary Committee relied on *Sure-Tan* to support its view that continued protection of undocumented workers under the labor laws is fully consistent with IRCA's goals:

> As the Supreme Court observed in *Sure-Tan*, application of the NLRA [to undocumented workers] "helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment."

*Id.* (internal citation omitted). Echoing this view, the House Education and Labor Committee Report states that no provision of the law should

> limit the powers of State or Federal labor standards agencies such as the Occupational Safety and Health Administration, the Wage and Hour Division of the Department of Labor, the Equal Employment Opportunity Commission, *the National Labor Relations Board*, or Labor arbitrators, in conformity with existing law, to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by these agencies. To do otherwise would be counter-productive

of our intent to limit the hiring of undocumented employees and the depressing effect on working conditions caused by their employment.

H.R.Rep. No. 99–682(II) at 8–9 (1986), reprinted in 1986 U.S.C.C.A.N. 5758 (emphasis added). Not only does this legislative history make clear that IRCA imposed no limits on labor law protections for undocumented workers, but the statute itself authorized supplemental appropriations to the Department of Labor for expanded enforcement of existing labor standards and practices "in order to deter the employment of unauthorized aliens and remove the economic incentives for employers to exploit and use such aliens." Pub.L. No. 99–603, § 111(d), 100 Stat. 3359 (1986). If as Hoffman argues IRCA limited labor law protection for undocumented workers, it hardly seems likely that IRCA would have simultaneously authorized additional funds to enforce the labor laws.

In formulating remedies for unfair labor practices committed against undocumented workers, moreover, the Board has not "ignore[d] other and equally important Congressional objectives." *Southern Steamship*, 316 U.S. at 47, 62 S.Ct. 886. To the contrary, it has "fully enforce[d] the requirements of its own statute [the NLRA] in a manner that minimizes the impact of its actions on the policies of the other statute [IRCA]." *New York Shipping*, 854 F.2d at 1367. In its first post-IRCA case dealing with undocumented discriminatees, *A.P.R.A. Fuel*, the Board observed that the NLRA and IRCA share "virtually identical policy objectives with respect to the American workplace," and concluded that it "can best achieve this mutuality of purpose and effect by vigorously enforcing the NLRA, including providing traditional Board remedies, with respect to all employees, to the extent that such enforcement does not require or encourage unlawful conduct by either employers or individuals." *A.P.R.A. Fuel*, 320 N.L.R.B. at 415, 411. "To do otherwise," the Board explained, "would in-

crease the incentives for some unscrupulous employers to play the provisions of the NLRA and IRCA against each other to defeat the fundamental objectives of each, while profiting from their own wrongdoing with relative impunity. Thus, these employers would be free to flout their obligations under the Act, secure in the knowledge that the Board would be powerless fully to remedy their violations." *Id.* at 415. Taking account of these common statutory goals, the Board in *A.P.R.A. Fuel* ordered its usual remedy of reinstatement with backpay but imposed two limitations to avoid any conflict with the policies underlying IRCA: it conditioned reinstatement on compliance with IRCA's employment eligibility verification requirements and terminated backpay when the discriminatees either are lawfully reinstated or, after a reasonable period of time, fail to produce the required employment documents. *See id.* (citing *NLRB v. Future Ambulette, Inc.*, 903 F.2d 140, 145 (2d Cir.1990) (conditioning reinstatement of a driver whose license had been suspended on his presentation of a valid driver's license within a reasonable period of time and placing a time limit on backpay liability to prevent the employer from being tempted to rehire the driver before he obtained a valid license)). According to the Board, this remedy—conditional reinstatement combined with limited backpay—best reconciles the goals of the NLRA and IRCA. *See A.P.R.A. Fuel*, 320 N.L.R.B. at 416; *see also Regal Recycling, Inc.*, 329 N.L.R.B. No. 38 (1999); *County Window Cleaning Co.*, 328 N.L.R.B. No. 26 (1999); *Intersweet, Inc.*, 321 N.L.R.B. 1 (1996).

Courts and administrative agencies agree that IRCA does not limit labor law protections afforded undocumented workers. Enforcing the Board's *A.P.R.A. Fuel* remedy, the Second Circuit held "without hesitation that IRCA did not diminish the Board's power to craft remedies for violations of the NLRA, provided that the Board's remedies do not conflict with the requirements of IRCA." *NLRB v. A.P.R.A. Fuel Oil Buyers Group, Inc.*, 134

F.3d at 56. Withholding backpay from undocumented workers would, the court explained, undermine the purposes of both IRCA and the NLRA. It would conflict with IRCA because "precluding the remedy would increase the incentives for employers to hire undocumented aliens," which would, in turn, increase the incentives that encourage illegal immigration. Withholding backpay would also frustrate collective bargaining rights of lawful U.S. workers under the NLRA, the court found:

> [T]he lack of a backpay remedy would make undocumented workers an easy target for employers resisting union organization, and, thus, frustrate the rights of lawful U.S. workers under the NLRA. An employer could intimidate United States citizens and other lawful residents by targeting undocumented workers for antiunion discharges. Or, alternatively, legal workers might be reluctant to organize in the first instance if the Board were unable to issue any remedy against illegal actions taken by employers against undocumented workers who support the union.

*Id.* at 58. *See also, e.g., Kolkka,* 170 F.3d at 941 (holding that IRCA does not limit the rights of undocumented workers to vote in union elections); *Patel v. Quality Inn South,* 846 F.2d 700, 704 (11th Cir. 1988) (applying the FLSA to undocumented aliens to further IRCA's goal of "eliminating employers' economic incentives to hire" them); *Contreras,* 25 F.Supp.2d at 1059–60 (continuing after IRCA to apply the FLSA to undocumented workers and to award them punitive damages, noting that "[t]he Ninth Circuit has taken the broader view of the *Sure-Tan* holding, upholding awards of back pay to undocumented aliens for wrongful employment practices if, during their time of discharge, the workers remained in the U.S. available for work, and the back pay period could be calculated with certainty"); *Escobar,* 814 F.Supp. at 1498 (holding that undocumented workers can recover damages for violations of the Migrant and Seasonal Agricultural Workers Protection Act, as amended by IRCA); *EEOC v. Switching Systems Div. of Rockwell Int'l Corp.,* 783 F.Supp. 369, 374 (N.D.Ill.1992) ("Title VII's protections extend to aliens who may be in this country either legally or illegally.") (post-IRCA); *Tortilleria "La Mejor,"* 758 F.Supp. 585 (holding that Title VII continues to apply to undocumented workers after IRCA); EEOC Enforcement Guidance on Remedies Available to Undocumented Workers Under Federal Employment Discrimination Laws, No. 915.002 (1999) (adopting the *A.P.R.A. Fuel* analysis and remedy for undocumented workers whose rights under Title VII, the Americans with Disabilities Act, the Rehabilitation Act, the Age Discrimination in Employment Act, or the Equal Pay Act are violated).

In contrast to the Board's limited backpay policy, Hoffman's position would undermine both IRCA and the NLRA. If employers are exempt from paying backpay to undocumented workers, they will favor undocumented over documented workers, thus increasing the incentives for unlawful immigration, precisely what IRCA is intended to prevent. As the Supreme Court said in *Sure-Tan,* "[i]f an employer realizes that there will be no advantage under the NLRA in preferring illegal aliens to legal resident workers, any incentive to hire such illegal aliens is correspondingly lessened. In turn, if the demand for undocumented aliens declines, there may then be fewer incentives for aliens themselves to enter in violation of the federal immigration laws." 467 U.S. at 893–94, 104 S.Ct. 2803. Denying backpay would likewise subvert the common policy underlying both IRCA and the NLRA, *i.e.,* maintaining wages and working conditions for authorized employees. *Sure-Tan* made this point as well: "Application of the NLRA helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard

terms of employment." *Id.* at 893, 104 S.Ct. 2803. Finally, excusing employers from paying backpay to undocumented workers would undermine the collective bargaining rights of all employees, including authorized workers. *Sure-Tan* put it this way:

> If undocumented alien employees were excluded from participation in union activities and from protections against employer intimidation, there would be created a subclass of workers without a comparable stake in the collective goals of their legally resident co-workers, thereby eroding the unity of all the employees and impeding effective collective bargaining. Thus, the Board's categorization of undocumented aliens as protected employees furthers the purposes of the NLRA.

*Id.* at 892, 104 S.Ct. 2803 (internal citation omitted). Elaborating in *A.P.R.A. Fuel*, the Board explained that because "undocumented aliens are extremely reluctant to complain to the employer or to any of the agencies charged with enforcing workplace standards," they make easy targets for an employer's "unprincipled effort to stave off . . . union representation." *A.P.R.A. Fuel*, 320 N.L.R.B. at 414. Employers resisting unions could simply fire undocumented workers who try to organize and then raise "the unlawful immigration status of their discharged employees in retaliation for protected activities;" employers might even "consider the penalties of IRCA a reasonable expense more than offset by the savings of employing undocumented workers or the perceived benefits of union avoidance." *Id.* at 415. This also harms the collective bargaining rights of authorized workers, the Board found, because "the continuous threat of replacement with powerless and desperate undocumented workers would certainly chill the American and authorized alien workers' exercise of their Section 7 rights." *Id.* at 414.

For all these reasons, we hold that the Board has fully satisfied its obligation to "accommodat[e] one statutory scheme to another." *Southern Steamship*, 316 U.S. at 47, 62 S.Ct. 886. The Board crafted its limited backpay remedy to avoid conflict with IRCA and to promote the purposes of both statutes. The remedy reduces employer incentives to prefer undocumented workers (IRCA's goal), reinforces collective bargaining rights for all workers (the NLRA's goal), and protects wages and working conditions for authorized workers (the goal of both Acts). Because these last two points reflect the Board's interpretation of the NLRA, we owe them considerable deference. *See, e.g., Sure-Tan*, 467 U.S. at 899, 104 S.Ct. 2803 (warning that courts "should not .substitute their judgment for that of the Board in determining how best to undo the effects of unfair labor practices"). If as Hoffman believes the Board has struck the wrong balance between the two statutes, its remedy lies in Congress, not this court.

\* \* \*

With this understanding of *Sure-Tan* and IRCA in mind, we return to the specific remedy the Board ordered in this case. To repeat, it denied Castro reinstatement altogether and limited his backpay to the period beginning with his unlawful termination and ending on the date Hoffman learned of his undocumented status. This remedy complies with *Sure-Tan* and IRCA in all respects.

First, unlike the Seventh Circuit's six-month minimum award in *Sure-Tan*, the Board's award of backpay to Castro was not at all speculative. The Board limited backpay to the period of time during which Castro could have continued working but for Hoffman's unfair labor practice. This represents precisely the kind of individual tailoring demanded by *Sure-Tan*. And unlike in *Sure-Tan*, the Board had no reason to worry that the remedy might encourage the discriminatee to re-enter the. country illegally—Castro had never left.

Second, the Board modified its usual *A.P.R.A. Fuel* remedy in this case to ensure that Castro's award would not conflict with immigration law. Although the usual

remedy includes reinstatement conditional on compliance with IRCA's verification provisions, the Board denied conditional reinstatement to Castro because, under IRCA, Hoffman's discovery of Castro's ineligibility to work would have required his termination. For the same reason, the Board ended Castro's backpay as of the date Hoffman discovered his true immigration status.

According to our dissenting colleague, requiring an employer to give backpay to an employee it cannot now lawfully hire "boggles the mind." *See infra.*, Sentelle, J., dissenting. It certainly would boggle the mind had the Board ordered reinstatement in contravention of IRCA, but it rejected that option. Instead it fashioned a limited remedy, carefully crafted to promote the goals of the NLRA without running afoul of IRCA. IRCA, as we point out above, does not make it unlawful for an *alien* to work; it makes it unlawful for an *employer* to hire "an alien knowing the alien is ... unauthorized." 8 U.S.C. § 1324a(a)(1)(A). Having now discovered Castro's unauthorized status, Hoffman can no longer employ him lawfully. But at the time Hoffman hired Castro, it complied with IRCA, and from that date until it learned he is unauthorized, nothing prohibited his continued employment. It was to that period of Castro's lawful availability for employment that the Board limited the backpay award. Far from boggling the mind, this remedy fully complies with *Sure-Tan* and avoids any violation of IRCA.

### III

■ Hoffman's additional arguments require little discussion. It claims that the Board misapplied the after-acquired evidence rule. According to Hoffman, Castro's undocumented status should have barred all backpay, not just backpay from the date Hoffman learned of Castro's status. For this proposition, Hoffman cites *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), but misreads the case.

In *McKennon*, the lower court had dismissed a discharged employee's lawsuit under the Age Discrimination in Employment Act because the employer learned that the plaintiff had violated company policy by making unauthorized copies of sensitive documents. The Supreme Court reversed, squarely rejecting the lower court's conclusion that discovery of "wrongdoing which would have resulted in discharge bars employees from any relief" for employers' unlawful acts. *Id.* at 356, 115 S.Ct. 879. Rejecting "[a]n absolute rule barring any recovery of backpay," the Court held that the typical remedy should be "backpay from the date of the unlawful discharge to the date the new information was discovered." *Id.* Consistent with its longstanding policy, that is precisely what the Board ordered in this case. *See, e.g., Marshall Durbin Poultry Co.*, 310 N.L.R.B. 68, 70 (1993), *enforced in pertinent part*, 39 F.3d 1312, 1317 (5th Cir. 1994); *John Cuneo, Inc.*, 298 N.L.R.B. 856, 857 (1990).

■ Equally without merit is Hoffman's argument that "[b]y awarding undocumented aliens backpay without any consideration regarding whether these individuals can mitigate their damages, the Board treats illegal aliens more favorably than documented workers and by doing so, the Board violates the equal protection clause of the Fifth Amendment to the United States Constitution." Not only do we doubt the company's standing to assert the equal protection rights of third parties, *see, e.g., Powers v. Ohio*, 499 U.S. 400, 410–16, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), but Hoffman points to no evidence that the Board applies a different mitigation standard to undocumented workers. In any event, the Board found that Castro had sought and obtained interim employment, thus fulfilling his duty to mitigate. The Board subtracted his interim earnings of almost $4,000 from the backpay award.

Finally, we think it worth repeating that Hoffman itself could have mitigated its

backpay liability either by making a bona fide reinstatement offer in its letter recalling Castro a few weeks after it fired him, or by complying promptly with the Board's reinstatement order. *See supra* at 233–34. INS regulations issued pursuant to IRCA expressly permit reinstatement after an unlawful discharge without requiring the employer to re-verify the employee's eligibility documents. *See* 8 C.F.R. § 274a.2(b)(viii)(A).

## IV

The petition for review is denied, and the cross-application for enforcement is granted.

*So ordered.*

APPENDIX A

## IV

There remains for us to consider petitioners' challenges to the remedial order entered in this case. Petitioners attack those portions of the Court of Appeals' order which modified the Board's original order by providing for an irreducible minimum of six months' backpay for each employee and by detailing the language, acceptance period, and verification method of the reinstatement offers.[*] We find that the Court of Appeals exceeded its narrow scope of review in imposing both these modifications.

### A

Section 10(c) of the Act empowers the Board, when it finds that an unfair labor practice has been committed, to issue an order requiring the violator to "cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies" of the NLRA. 29 U. S. C. § 160(c). The Court has repeatedly interpreted this statutory command as vesting in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial

---

[*] Petitioners do not challenge the cease and desist order imposed by the Board and affirmed by the Court of Appeals. Under such an order, petitioners will be subject to contempt sanctions should they again resort to the discriminatory tactics employed here. Nor do petitioners appear to challenge the court's modifications of the Board's remedial order conditioning acceptance of the reinstatement offers and the accrual of any backpay upon the discharged employees' legal presence in this country. See n. 12, *infra*.

review. See, *e. g.*, *NLRB* v. *J. H. Rutter-Rex Mfg. Co.*, 396 U. S. 258, 262–263 (1969); *Fibreboard Paper Products Corp.* v. *NLRB*, 379 U. S. 203, 216 (1964); *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 194 (1941). Although the courts of appeals have power under the Act "to make and enter a decree . . . modifying, and enforcing as so modified" the orders of the Board, 29 U. S. C. §§ 160(e), (f), they should not substitute their judgment for that of the Board in determining how best to undo the effects of unfair labor practices:

> "Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." *Phelps Dodge Corp.*, *supra*, at 194.

See also *NLRB* v. *Seven-Up Bottling Co.*, 344 U. S. 344, 346 (1953) (power to fashion remedies "is for the Board to wield, not for the courts").

Here, the Court of Appeals impermissibly expanded the Board's original order to provide that each discriminatee would receive backpay for at least six months on the ground that "six months is a reasonable assumption" as to the "minimum [time] during which the discriminatees might reasonably have remained employed without apprehension by INS, but for the employer's unfair labor practice." 672 F. 2d, at 606. We agree with petitioners that this remedy ordered by the Court of Appeals exceeds the limits imposed by the NLRA.[9]

---

[9] JUSTICE BRENNAN asserts that since the Board has "fully acquiesced" in the Court of Appeals' remedy, the case should be reviewed as if the Board itself had developed the remedial order. See *post*, at 907. This argument misses the mark on two levels. First, our traditional deference to such remedial orders is premised upon our appreciation that the Board has duly considered and brought to bear its "special competence" in fashioning appropriate relief in any given unfair labor practice case. See *NLRB* v. *J. Weingarten, Inc.*, 420 U. S. 251, 265–266 (1975). Given the

Not only did the court overstep the limits of its own reviewing authority, see *NLRB* v. *Seven-Up Bottling Co.*, *supra*, at 346–347,[10] but it also effectively compelled the Board to take action that simply does not lie within the Board's own powers. Under § 10(c), the Board's authority to remedy unfair labor practices is expressly limited by the requirement that its orders "effectuate the policies of the Act." Although this rather vague statutory command obviously permits the Board broad discretion, at a minimum it encompasses the requirement that a proposed remedy be tailored to the unfair labor practice it is intended to redress. Quite early on, the Court established that "the relief which the statute empowers the Board to grant is to be adapted to the situation which calls for redress." *NLRB* v. *MacKay Radio & Telegraph Co.*, 304 U. S. 333, 348 (1938). See D. McDowell & K. Huhn, NLRB Remedies for Unfair Labor Practices 8–15 (1976). Of course, the general legitimacy of the backpay order as a means to restore the situation "as nearly as possible, to that which would have obtained but for the illegal discrimination," *Phelps Dodge Corp.*, 313 U. S., at 194, is by now beyond dispute. Yet, it remains a cardinal, albeit frequently unarticulated assumption, that a backpay remedy must be sufficiently tailored to expunge only the *actual*, and not merely *speculative*, consequences of the unfair labor practices. *Id.*, at 198 ("[O]nly actual losses should be made

disparity between the Board's original order and the Court of Appeals' modified order, that premise is patently inapplicable to this case. Moreover, the Board's mere acquiescence in the Court of Appeals' remedial order simply cannot correct the order's main deficiency—its development in the total absence of any record evidence as to the circumstances of the individual employees.

[10] In imposing a minimum backpay award, the Court of Appeals usurped the delegated function of the Board to decide how best to appraise the relevant factors that determine a just backpay remedy. The proper course for a reviewing court that believes a Board remedy to be inadequate is to remand the case to the Board for further consideration. See *supra*, at 899; *NLRB* v. *Food Store Employees*, 417 U. S. 1, 10 (1974).

good . . .").   To this end, we have, for example, required that the Board give due consideration to the employee's responsibility to mitigate damages in fashioning an equitable backpay award.   See, *e. g., NLRB v. Seven-Up Bottling Co., supra,* at 346; *Phelps Dodge Corp. v. NLRB, supra,* at 198.   Likewise, the Board's own longstanding practice has been to deduct from the backpay award any wages earned in the interim in another job, see *Pennsylvania Greyhound Lines, Inc.,* 1 N. L. R. B. 1, 51 (1935), enf'd, 91 F. 2d 178 (CA3 1937), rev'd on other grounds, 303 U. S. 261 (1938).

By contrast, the Court of Appeals' award of a minimum amount of backpay in this case is not sufficiently tailored to the actual, compensable injuries suffered by the discharged employees.   The court itself admitted that although it sought to recompense the discharged employees for their lost wages, the actual 6-month period selected was "obviously conjectural."   672 F. 2d, at 606.   The court's imposition of this minimum backpay award in the total absence of record evidence as to the circumstances of the individual employees constitutes pure speculation and does not comport with the general reparative policies of the NLRA.[11]

---

[11] We are also mindful that, prior to the instant case, the Board itself had never claimed the power given it here by the Court of Appeals.   To our knowledge, the Board has never attempted to impose a minimum backpay award that the employer must pay regardless of the actual evidence as to such issues as an employee's availability for work or his efforts to secure comparable interim employment.   In fact, in this very case, the Board had already rejected as "unnecessarily speculative" the ALJ's recommendation that a 4-week minimum period of backpay be awarded the discharged employees.   234 N. L. R. B., at 1187.   The Board now argues that the Court of Appeals' backpay award involves no greater speculation than that which is normally involved in reconstructing what would have happened to certain employees but for their discriminatory discharge.   See, *e. g., NLRB v. Superior Roofing Co.,* 460 F. 2d 1240 (CA9 1972) *(per curiam); Buncher v. NLRB,* 405 F. 2d 787 (CA3 1968), cert. denied, 396 U. S. 828 (1969).   In each of these cases, however, the courts enforced the Board's orders upon finding that the Board, in the course of compliance proceedings, had applied to particular facts a reasonable formula for determining the probable

We generally approve the Board's original course of action in this case by which it ordered the conventional remedy of reinstatement with backpay, leaving until the compliance proceedings more specific calculations as to the amounts of backpay, if any, due these employees. This Court and other lower courts have long recognized the Board's normal policy of modifying its general reinstatement and backpay remedy in subsequent compliance proceedings as a means of tailoring the remedy to suit the individual circumstances of each discriminatory discharge. See *NLRB* v. *J. H. Rutter-Rex Mfg. Co.*, 396 U. S., at 260; *Nathanson* v. *NLRB*, 344 U. S. 25, 29–30 (1952); *Trico Products Corp.* v. *NLRB*, 489 F. 2d 347, 353–354 (CA2 1973). Cf. *Teamsters* v. *United States*, 431 U. S. 324, 371 (1977) (individual Title VII claims to be resolved at remedial hearings held by District Court on remand). These compliance proceedings provide the appropriate forum where the Board and petitioners will be able to offer concrete evidence as to the amounts of backpay, if any, to which the discharged employees are individually entitled. See *NLRB* v. *Mastro Plastics Corp.*, 354 F. 2d 170 (CA2 1965), cert. denied, 384 U. S. 972 (1966); 3 NLRB Casehandling Manual § 10656 *et seq.* (1977) (preparation of backpay specification).

Nonetheless, as the Court of Appeals recognized, the implementation of the Board's traditional remedies at the com-

---

length of employment and compensation due and had permitted the employer to come forward with evidence mitigating liability. See, *e. g.*, *NLRB* v. *Superior Roofing Co.*, *supra*, at 1240–1241 (upholding use of a "seniority formula" to compute the earnings of a "representative employee" in a reasonable approximation of discharged roofer's earnings). In the instant case, the Court of Appeals "estimated" an appropriate period of backpay without any evidence whatsoever as to the period of time these particular employees might have continued working before apprehension by the INS and without affording petitioners any opportunity to provide mitigating evidence. In the absence of relevant factual information or adequate analysis, it is inappropriate for us to conclude, as does JUSTICE BRENNAN, that the Court of Appeals had estimated the proper minimum backpay award "with a fair degree of precision," see *post*, at 909.

pliance proceedings must be conditioned upon the employees' legal readmittance to the United States. In devising remedies for unfair labor practices, the Board is obliged to take into account another "equally important Congressional objectiv[e]," *Southern S.S. Co. v. NLRB*, 316 U. S. 31, 47 (1942)—to wit, the objective of deterring unauthorized immigration that is embodied in the INA. By conditioning the offers of reinstatement on the employees' legal reentry, a potential conflict with the INA is thus avoided. Similarly, in computing backpay, the employees must be deemed "unavailable" for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States. Cf. 3 NLRB Casehandling Manual §§ 10612, 10656.9 (1977).[12]

The Court of Appeals assumed that, under these circumstances, the employees would receive no backpay, and so

---

[12] Conditioning the offers of reinstatement on the employees' legal reentry and deeming the employees "unavailable" during any period when they were not lawfully present are requirements that were in fact imposed by the Court of Appeals in this case, and hence fully accepted by the Board. See 672 F. 2d, at 606 ("Consistent with our requirement that there be reinstatement only if the discriminatees are legally present and permitted by law to be employed in the United States we modify the Board's order so as to make clear (1) that [except for the minimum backpay award] in computing backpay discriminatees will be deemed unavailable for work during any period when not lawfully entitled to be present and employed in the United States . . ."); App. to Pet. for Cert. 32a (modified order). Contrary to JUSTICE BRENNAN's assertion, see *post*, at 910, the Board does not argue that it would exempt these employees from its "unavailability" policy because their unavailability is directly attributable to the employer's own unfair labor practice. The Board refers to this limited exception to its normal rule solely to counter petitioners' suggestion that the minimum backpay award is somehow logically "inconsistent" with normal Board policies in calculating backpay. See Brief for Respondent 45, n. 44. The Board has clearly indicated its agreement with these portions of the Court of Appeals' remedial order by specifically noting that petitioners do not challenge these parts of the order, see *id.*, at 43, by limiting its own argument to the minimum backpay award issue alone, see *id.*, at 43–46, and, most importantly, by asking that the judgment below be affirmed in its entirety.

awarded a minimum amount of backpay that would effectuate the underlying purposes of the Act by providing some relief to the employees as well as a financial disincentive against the repetition of similar discriminatory acts in the future. 672 F. 2d, at 606. We share the Court of Appeals' uncertainty concerning whether any of the discharged employees will be able either to enter the country lawfully to accept the reinstatement offers or to establish at the compliance proceedings that they were lawfully available for employment during the backpay period. The probable unavailability of the Act's more effective remedies in light of the practical workings of the immigration laws, however, simply cannot justify the judicial arrogation of remedial authority not fairly encompassed within the Act. Any perceived deficiencies in the NLRA's existing remedial arsenal can only be addressed by congressional action.[13] By directing the Board to impose a minimum backpay award without regard to the employees' actual economic losses or legal availability for work, the

---

[13] According to JUSTICE BRENNAN, the Court stands guilty today of creating a "disturbing anomaly" by, on the one hand, holding that undocumented aliens are "employees" within the meaning of the Act and so entitled to bring an unfair labor practice claim, but then, on the other hand, holding that these same employees are "effectively deprived of any remedy . . . ." See post, at 911. This argument completely ignores the fact that today's decision leaves intact the cease and desist order imposed by the Board, see n. 7, supra, one of the Act's traditional remedies for discriminatory discharge cases. Were petitioners to engage in similar illegal conduct, they would be subject to contempt proceedings and penalties. This threat of contempt sanctions thereby provides a significant deterrent against future violations of the Act. At the same time, we fully recognize that the reinstatement and backpay awards afford both more certain deterrence against unfair labor practices and more meaningful relief for the illegally discharged employees. Nevertheless, we remain bound to respect the directives of the INA as well as the NLRA and to guard against judicial distortion of the statutory limits placed by Congress on the Board's remedial authority. Any other solution must be sought in Congress and not the courts.

252

Court of Appeals plainly exceeded its limited authority under the Act.[14]

---

[14] In light of our disposition of this issue, we find it unnecessary to consider petitioners' claim that the minimum backpay awards are "punitive," and hence beyond the authority of the Board under *Republic Steel Corp.* v. *NLRB*, 311 U. S. 7, 9–12 (1940). We may thus avoid entering into what we have previously deemed "the bog of logomachy" as to what is "remedial" and what is "punitive." *NLRB* v. *Seven-Up Bottling Co.*, 344 U. S. 344, 348 (1953).

SENTELLE, Circuit Judge, dissenting: In May of 1988, an undocumented alien having illegally entered the United States compounded his illegality when he fraudu-

lently used the name and birth certificate of Jose Castro to obtain employment in the production plant of Hoffman Plastic. On January 31, 1989, the company laid off a number of employees supportive of a union organizing effort, including the employee (whose true name is still unknown) who had falsely represented himself to be Jose Castro. Thereafter, an administrative law judge, following an evidentiary hearing, found that Hoffman had engaged in unfair labor practices including the discriminatory selection of union adherents in the layoffs which included the illegal alien known as Castro.

After the disclosure of the undocumented worker's illegal status and his fraudulent use of the birth certificate, the administrative law judge unsurprisingly recommended neither reinstatement nor backpay. I find this decision by the administrative law judge unsurprising for multiple reasons. First, as it would be unlawful for Hoffman to employ the illegal and pay him earned wages, it defies logic—indeed it boggles the mind—to suppose that the employer could be compelled by law to pay to the illegal unearned wages which he could not lawfully earn and to which he would have no claim but for his prior successful fraud. If this were a case of first impression I would find it simple. I would hold that by no theory of law or equity could the federal government compel an employer to employ an illegal alien to do nothing and pay him for doing nothing when it could not lawfully employ him to work and pay him for working. But this is not a case of first impression. There is controlling Supreme Court law which makes the case an even easier one.

### Analysis

In *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), the Supreme Court reviewed a Seventh Circuit decision which had modified an NLRB order applying the National Labor Relations Act to unfair labor practices committed against undocumented aliens. *See NLRB v. Sure–Tan, Inc.*, 672 F.2d 592

(7th Cir.1982). The High Court concluded that the Circuit was correct in upholding the Board's position "that undocumented aliens are 'employees' within the meaning of [29 U.S.C. § 152(3) ]." 467 U.S. at 891, 104 S.Ct. 2803. The Court reached this conclusion based on the deference owed the Board in "defining the term 'employee,'" a task "that 'has been assigned primarily to the agency created by Congress to administer the Act.'" *Id.* at 891, 104 S.Ct. 2803 (quoting *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130, 64 S.Ct. 851, 88 L.Ed. 1170 (1944)); *cf. Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). That said, the Supreme Court nonetheless vacated the remedial portion of the Seventh Circuit decision, which had ordered the Board to award an irreducible minimum of six months backpay to each of the affected employees even in the face of the employees' illegal entry and presence in the United States. In vacating that portion of the Seventh Circuit decision, the Supreme Court held, "[b]y directing the Board to impose a minimum backpay award without regard to the employees' actual economic losses or *legal availability for work*, the Court of Appeals plainly exceeded its limited authority under the Act." *Sure-Tan*, 467 U.S. at 904–05, 104 S.Ct. 2803 (emphasis added). Based on that italicized phrase, even if this were all the Supreme Court had held on the question, I would nonetheless conclude that *Sure-Tan* compels us to vacate the Board's decision overruling the logical result reached by the administrative law judge. But the Supreme Court did not stop there.

The Supreme Court explicitly rejected the position taken by the NLRB and the majority in today's decision when it held, "[s]imilarly, in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." *Id.* at 903, 104 S.Ct. 2803. It is difficult to see how the Court could more clearly have decided the question oppositely to the Board's resolution in the decision we now review.

Read in context, the sentence speaks even more plainly:

> Nonetheless, as the Court of Appeals recognized, the implementation of the Board's traditional remedies at the compliance proceedings must be conditioned upon the employees' legal readmittance to the United States. In devising remedies for unfair labor practices, the Board is obliged to take into account another equally important Congressional objective—to wit, the objective of deterring unauthorized immigration that is embodied in the INA. By conditioning the offers of reinstatement on the employees' legal reentry, a potential conflict with the INA is thus avoided. *Similarly, in computing backpay, the employees must be deemed "unavailable" for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States.*

*Sure-Tan,* 467 U.S. at 902–03, 104 S.Ct. 2803 (emphasis added) (internal quotation marks and citation omitted). In a feat of *ipse dixit,* the logic of which escapes me, the majority today declares that this paragraph demonstrates that the Supreme Court's holding in the final sentence has nothing to do with the issues before us. The Supreme Court in a rather concise paragraph makes it plain that it is dealing with the possibility of affording a backpay remedy to illegal aliens. It further makes it plain that such a remedy is not an option when the employees are "deemed unavailable" for work and that such a period of deemed unavailability occurs "during any period when they were not lawfully entitled to be present and employed in the United States." The majority refuses to apply this rather simple statement of law that a lack of legal presence in the country constitutes unavailability for employment to the anonymous person known as Castro. The majority reaches this conclusion by creating a dichotomy—never mentioned by the Supreme Court—between illegal aliens who have departed the United States without legally re-entering and those like the illegal alien known as Castro who may or may not have interrupted the continuity of their illegal stay in the country. *See* Maj. Op. at 237–38. Having created the dichot-

omy heretofore unrecognized by the Supreme Court, the majority then refuses to apply the sentence by its terms to persons in the newly minted subcategory, apparently because the Supreme Court did not separate out the subcategory and reaffirm the applicability of the stated principle to it. The majority does not recognize that neither does the Court ever suggest that application is limited to employees whose legal unavailability arises from an interrupted period of illegal presence as opposed to a continuous one.

The majority accuses me of taking a sentence out of context from the Supreme Court's decision. For its proposition that the quoted sentence is not applicable, the majority expends several pages of type and suggests ways of supplying emphases not present in the opinion to get around the apparent meaning of the Supreme Court's language that "employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." Read in context, read out of context, or read both ways and compared, the majority is left with no way of dealing with the High Court's plain statement. I invite the reader to review the phrase "not lawfully entitled to be present and employed" in its original context. I further suggest that contextual illumination for this sentence of the High Court's opinion is supplied in the Court's analysis of the Seventh Circuit decision that it was reversing. The High Court described that decision as "[r]ecognizing that the discharged employees would most likely not have been lawfully available for employment and so *would receive no backpay award at all....*" *Sure–Tan,* 467 U.S. at 890, 104 S.Ct. 2803 (emphasis added). Thus, the governing factor in determining eligibility for backpay awards is not mere presence, but also the lawful entitlement to be present.

The majority fundamentally errs in rewriting the phrase "not lawfully entitled to be present and employed in the United States" so that it has no application to a case like the present one in which an alien

fits precisely within the situation described by that phrase: *i.e.,* an alien who is present in the United States but without legal permission to be present and without a legal right to be employed here. In effect, that view rewrites the phrase to read "not present, and not lawfully entitled to be present in the United States." It adds the "not present" limitation and deletes the "not lawfully entitled to be ... employed" requirement. That rewriting of *Sure-Tan* leads the majority astray.

The rewriting of *Sure-Tan* endorsed by the majority appears to have first occurred in *Bevles Co. v. Teamsters Local 986,* 791 F.2d 1391, 1393 (9th Cir.1986). Before that time, even its critics believed that *Sure-Tan* meant what it said. *See Sure-Tan,* 467 U.S. at 911, 104 S.Ct. 2803 (Brennan, J., dissenting) (criticizing the majority for holding that undocumented aliens "are effectively deprived of any remedy"); *Felbro, Inc.,* 274 N.L.R.B. 1268, 1269 (1985) (stating that the undocumented aliens in *Felbro,* who had remained in the country, would be affected by *Sure-Tan*); *Local 512, Warehouse & Office Workers' Union v. NLRB,* 795 F.2d 705, 725 (9th Cir.1986) ("*Felbro*") (Beezer, J., dissenting in part); Terry A. Bethel, *Recent Labor Law Decisions of the Supreme Court,* 45 Md. L.Rev. 179, 196 (1986) ("*Sure-Tan* ... deprive[s] undocumented employees of any effective remedy for unlawful discrimination...."); Lucinda M. Cardinal, Note, *Immigration Reform: Solving the "Problem" of the Illegal Alien in the American Workforce,* 7 Cardozo L.Rev. 223, 244 (1985) ("*Sure-Tan* mandates that illegal aliens do not receive the remedies granted their legal coworkers."); John W. Sagaser, Note, *Rights Without A Remedy—Illegal Aliens Under the National Labor Relations Act,* 27 B.C. L.Rev. 407, 452 (1986) ("By denying a minimum backpay award, the Court in effect deprives illegal alien workers of any remedy."). In *Bevles,* the court was reviewing an arbitrator's award; the issue was whether the arbitrator's decision showed a "manifest disregard of the law," and the court was not entitled to reverse erroneous legal conclusions. *See* 791 F.2d at 1392–93 & n. 2. In not following *Sure-Tan,* the court ignored the lawful presence requirement and considered whether the aliens in that case were lawfully entitled to be employed. The court clearly relied on the fact that—prior to the passage of IRCA— it was not a criminal act for employers to hire undocumented aliens. *See id.* at 1393. The court also considered the effect of section 2805 of the California Labor Code, which prohibited employers from knowingly employing undocumented aliens if it would affect lawful workers. Because an unreversed state court decision had previously held section 2805 unconstitutional, the court did not fault the arbitrator for disregarding it. *See id.* at 1393–94.

The focus on the lawful right to seek employment continued in *Felbro.* The Ninth Circuit there again relied on the fact that it was not illegal for an employer to hire undocumented aliens. Because the *Sure-Tan* employees could not lawfully reenter the United States, the court noted that they were "unavailable for work during the backpay period." *Felbro,* 795 F.2d at 719. The court reasoned that being present in the United States did not create unavailability because "[t]here is no provision 'in the INA making it unlawful for an employer to hire an alien who is present or working in the United States without appropriate authorization.'" *Id.* (quoting *Sure-Tan,* 467 U.S. at 892–93, 104 S.Ct. 2803).

Since the passage of IRCA, both the Second and Ninth Circuits have registered concern over IRCA's effect on their misguided attempts to limit *Sure-Tan.* In *Rios v. Enterprise Ass'n Steamfitters Local Union 638,* 860 F.2d 1168 (2d Cir. 1988), the Second Circuit was careful to explain that recovery was only permissible because the claimants were "available for employment during the entire period covered by the backpay order, since such employment would have violated no immigration law." *Id.* at 1173. The court explicitly reserved the question of whether IRCA would affect later claims. *See id.* at 1172 n. 2. The Ninth Circuit likewise has questioned the viability of its *Felbro* decision after IRCA. *See EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1517–18 n. 11

(9thCir.1989). In a further Second Circuit case postdating the enactment of IRCA, that circuit continued to follow its pre-enactment precedent. *See NLRB v. A.P.R.A. Fuel Oil Buyers Group, Inc.,* 134 F.3d 50 (2d Cir.1997). However, as Judge Jacobs clearly demonstrated on dissent, without the slender reed of the employer's legal capacity to hire undocumented aliens, "an undocumented alien is not *'lawfully* available for employment.'" *Id.* at 62 (Jacobs, J., dissenting) (quoting *Sure-Tan,* emphasis supplied by Judge Jacobs). As Judge Jacobs pointed out, the remedy of backpay to the alien ineligible for employment "is foreclosed by *Sure-Tan* and IRCA...." *Id.*

Like the Second Circuit in *A.P.R.A. Fuel,* the majority today offers nothing that should lead us to believe that the Supreme Court in *Sure-Tan* meant anything other than what it said; and what it said disqualifies the illegal alien in this case from an award of backpay.

### Conclusion

For the reasons set forth above, I would grant Hoffman Plastic's petition for review of the Board's order, and deny the cross-petition for employment. I respectfully dissent.

BEFORE: EDWARDS, Chief Judge; SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL, and GARLAND,* Circuit Judges.

### ORDER
### June 16, 2000

Per Curiam.

Upon consideration of petitioner's petition for rehearing *en banc,* the response thereto, and the vote by a majority of the judges of the court in regular active service in favor of the petition, it is

ORDERED that the petition be granted. This case will be reheard by the court sitting *en banc.* It is

FURTHER ORDERED that the judgment filed herein on March 17, 2000 is hereby vacated.

* Circuit Judge Garland did not participate in

An order governing further proceedings will issue at a later date.